(No. 53212.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JOHN WAYNE GACY, Appellant.

*Opinion filed June 6, 1984.—Rehearing denied September 28, 1984.*

SIMON, J., concurring in part and dissenting in part.

Steven Clark, Deputy Defender, and Michael J. Pelletier and Alan D. Goldberg, Assistant Appellate Defenders, of the Office of the State Appellate Defender, of Chicago (Ralph Ruebner, of counsel), for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (William J. Kunkle, Jr., Chief Deputy State's Attorney, and Michael E. Shabat, Joan S. Cherry, James S. Veldman and Kevin Sweeney, Assistant State's Attorneys, of counsel), for the

People.

David C. Sobelsohn and Linda E. Fisher, of Chicago, for *amici curiae* American Civil Liberties Union *et al.*

JUSTICE GOLDENHERSH delivered the opinion of the court:

In indictments returned in the circuit court of Cook County, defendant, John Wayne Gacy, was charged with 33 counts of murder, one count of deviate sexual assault, one count of indecent liberties with a child, and one count of aggravated kidnaping. The circuit court allowed defendant's motion that one trial be held on all pending indictments. Following a jury trial during which the charge of aggravated kidnaping was dismissed, defendant was found guilty on all of the other counts. In a hearing requested by the People concerning the 12 murders committed subsequent to the enactment of the death penalty provision of section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1), the jury found that one or more of the factors set forth in section 9—1(d) existed, and found that there were no mitigating factors sufficient to preclude a sentence of death. Defendant was sentenced to death on 12 counts of murder and to terms of natural life on each of the remaining murder counts. The sentences were stayed (87 Ill. 2d R. 609(a)) pending appeal to this court (Ill. Const. 1970, art. VI, sec. 4(b); 87 Ill. 2d R. 603).

The testimony shows that on the evening of December 11, 1978, Robert Piest, a 15-year-old boy, worked at the Nisson Pharmacy in Des Plaines. His mother had driven to the pharmacy to pick him up after work and he told her that he was going to see a building contractor about a summer job and would be back in a few minutes. He was never again seen alive. Defendant was a building contractor and had spent much of the evening in the Nisson Pharmacy. At about the time Piest disappeared,

defendant's truck was seen outside the pharmacy. The Des Plaines police department suspected that defendant was involved in Piest's disappearance. The police learned that he had a record of sexually assaulting young men and had been convicted in Iowa for an assault on a teen-age boy. A more detailed review of the facts surrounding the investigation and the issuance and execution of several search warrants will be set forth in the discussion of the issues.

In the course of the investigation defendant admitted that he had killed approximately 30 individuals, some buried in the crawl space under his home and five thrown into the Des Plaines River. Excavation of the crawl space and the area surrounding defendant's home recovered 29 bodies. In addition, four bodies were recovered from the Des Plaines and Illinois rivers, downstream from the place where defendant had told the police that he threw the bodies.

Defendant contends first that the circuit court erred in denying his motion to suppress the evidence seized as the result of the search warrant issued on December 13, 1978, and argues that both the complaint for the search warrant and the search warrant itself were defective. The complaint stated:

"I, Joseph Kozenczak, Detective Lt. with the Des Plaines Police Dept. received information on Dec. 11, 1978 concerning the missing persons case report on Robert J. Piest M/W 15 DOB: March 1963 5'8, 140 lbs, brown hair and a slim build. During the course of my police investigation the following information was revealed, that Piest was last seen at 1920 Touhy Ave. in Des Plaines in Nisson Drugs where he works by Kim Byers a fellow employee. Byers stated that Piest approached her and said, 'Come watch the register; that contractor guy wants to talk to me, I'll be right back.' At which time Piest went outside of the store to meet with John W. Gacy. Mrs. Elizabeth Piest, the missing boy's mother was also in the store at this time and was waiting to pick her

son up from work. Prior to leaving the store her son requested that she wait a few minutes while he spoke to a subject about a Summer construction job. Mrs. Piest waited over twenty minutes in the store and then began looking for her son. Robert Piest left the store at approximately 2100 hrs. and has not been seen or heard from since.

On the date in question John W. Gacy was observed in the store at 1920 Touhy Ave. on two different occasions. Once at 6:00 P.M. and a second time at 8:00 P.M. at which time he stayed in the store until 8:50 P.M. which was the approximate time that the missing person Robert J. Piest disappeared from the store location. During the course of my investigation it was found that John W. Gacy is in fact a contractor and owner of same, which is under the name of PDM Construction Company, located at 8213 W. Summerdale, Norridge, Ill. which is his residence.

A one story ranch type house, brick structure with semi-circle drive in front and a driveway on the east side of the building. The property also contains an oversize brick garage in the rear of the property. Also included is a Black Van truck with 'PDM' painted on it along with a black pickup truck with 'PDM' on its side, also, a black 1979 Oldsmobile Illinois Lic. #PDM42, Vin: 3N69R9X105706.

During the course of my investigation, I learned that John W. Gacy was arrested and convicted in Waterloo, Iowa in 1968 for Sodomy and sentenced to 10 yrs. in prison. The Sodomy arrest involved 15 and 16 year old youths. In 1968 John W. Gacy was arrested for Conspiracy — Assault with attempt to commit Felony on 15 and 16 year old youths — CD3036939. Subject was also arrested on June 22, 1972 by the Northbrook, Ill. police Dept. Case #7204499 — Aggravated Battery and Reckless Conduct, which was a sex related offense.''

The search warrant recited that probable cause had been established and it directed the police to:

''*** search John W. Gacy and 8213 W. Summerdale — Norridge, Ill. and the following described vehicles: and seize Light blue down jacket and hood, tan colored Levi

Pants — Brown wedge type suede shoes — lace type — Brown leather wallet — Levi T-Shirt, along with hair samples, blood stained clothing and dried blood samples, along with the following three vehicles:

1) Black van truck with 'PDM' on side
2) Black pick-up truck with 'PDM' on side
3) Black 1979 Oldsmobile Ill. Lic. 1978 'PDM 42' Vin: 3n69R9X105706."

Defendant argues that the warrant failed to satisfy the "basis of knowledge" test of *Aguilar v. Texas* (1964), 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509, and failed to disclose sufficient facts to establish probable cause. In reviewing the sufficiency of the complaint we are guided by the Supreme Court's statement in *Spinelli v. United States* (1969), 393 U.S. 410, 21 L. Ed. 2d 637, 89 S. Ct. 584, "that only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause, *Beck v. Ohio* [(1964), 379 U.S. 89, 96, 13 L. Ed. 2d 142, 147-48, 85 S. Ct. 223, 228]; that affidavits of probable cause are tested by much less rigorous standards than those governing the admissibility of evidence at trial, *McCray v. Illinois* [(1967), 386 U.S. 300, 311, 18 L. Ed. 2d 62, 70, 87 S. Ct. 1056, 1062]; that in judging probable cause issuing magistrates are not to be confined by niggardly limitations or by restrictions on the use of their common sense, *United States v. Ventresca* [(1965), 380 U.S. 102, 108, 13 L. Ed. 2d 684, 688, 85 S. Ct. 741, 745]; and that their determination of probable cause should be paid great deference by reviewing courts, *Jones v. United States* [(1960), 362 U.S. 257, 270-71, 4 L. Ed. 2d 697, 708, 80 S. Ct. 725, 735-36]." (393 U.S. 410, 419, 21 L. Ed. 2d 637, 645, 89 S. Ct. 584, 590-91.) We are not concerned, as was the court in *Aguilar,* with the reliability of an unnamed informant because it is readily apparent from the affidavit from whom the hearsay information contained in the complaint was obtained. The judge to whom the complaint is submitted

must make a judgment whether probable cause existed, and the information furnished him "must provide the affiant's answer to the magistrate's hypothetical question, 'What makes you think that the defendant committed the offense charged?' " *Jaben v. United States* (1965), 381 U.S. 214, 224, 14 L. Ed. 2d 345, 353, 85 S. Ct. 1365, 1371.

Defendant argues that Lieutenant Kozenczak's statements were conclusional and did not identify the sources of his information or answer basic questions such as "Who stated John W. Gacy was in the store two times? How did he, she or they know it was Gacy? Was this information acquired through firsthand or personal knowledge of the informant?" Defendant argues too that the information presented to the warrant judge did not support a reasonable belief that the crime of unlawful restraint had been committed. Defendant suggests:

> "At best, it is perhaps unusual or suspicious when a 15-year-old boy does not return to his place of employment after he says he will be right back. *** Even if Piest's disappearance was suspicious, there is no indication, from the facts cited, that John Gacy had any connection with this disappearance."

Defendant asserts that there was insufficient information to support a finding of probable cause that evidence of the crime of unlawful restraint might be found in the places designated to be searched.

We agree with the People that the sufficiency of the complaint does not rest on whether each segment is complete in itself but whether the complaint, considered as a whole, adequately establishes that there was "a fair probability that *** evidence of a crime [would] be found in a particular place." (*Illinois v. Gates* (1983), 462 U.S. 213, 238, 76 L. Ed. 2d 527, 548, 103 S. Ct. 2317, 2332; see also *People v. Morano* (1970), 45 Ill. 2d 60, 63.) A common sense reading of the complaint would indicate that Lieutenant Kozenczak received his information from

Kim Byers, Robert Piest's fellow employee, and Mrs. Elizabeth Piest, his mother. That the complaint does not set forth in detail how one of these individuals was able to identify John Gacy as the contractor with whom Piest went to speak is not a fatal defect. Furthermore, much of the hearsay information was received, not from an undisclosed professional informant, but from the victim's mother. That the mother of a missing 15-year-old boy would not be likely to supply misinformation to the police searching for her son was a factor appropriately considered by the judge who ordered the warrant to issue.

The assertion that the complaint contained insufficient facts to establish probable cause is without merit. Defendant concedes that it is proper, under certain circumstances, to consider prior arrests and convictions of a suspect in determining whether probable cause exists. (See *Beck v. Ohio* (1964), 379 U.S. 89, 13 L. Ed. 2d 142, 85 S. Ct. 223; *United States v. McNally* (3d Cir. 1973), 473 F.2d 934.) Here, Lieutenant Kozenczak's complaint indicated that he had information concerning the suspect's criminal history and had discovered a significant pattern of sexual misconduct involving young men. Nor do we agree with defendant that it was not indicative that a crime had been committed but only "unusual" or "suspicious" when a 15-year-old boy stated that he was going to speak with the suspect, left his place of employment, and then failed to return.

Defendant next asserts that the complaint was fatally defective in that it failed to state the time when the informants made their observations. Defendant points out that the complaint stated only that Lieutenant Kozenczak had received this information on December 11, 1978, but does not indicate on what date Piest was last seen at the drugstore. Defendant suggests, in his reply brief, that "[m]issing person cases may remain unsolved for weeks, months, or years." Defendant concludes that

"[w]ithout more specific information regarding time, a reasonable person could not have concluded that evidence of the alleged offense was presently on the premises to be searched." We disagree. A common sense reading of the complaint indicates that Lieutenant Kozenczak received this information while investigating a missing person report at Nisson Pharmacy on December 11, 1978. We conclude that the issuing judge had a substantial basis for concluding that probable cause existed, and we decline to disturb his determination.

Defendant contends next that the warrant failed to describe with particularity the items to be seized. The items to be seized were "Light blue down jacket and hood, tan colored Levi Pants — Brown wedge type suede shoes — lace type — Brown leather wallet — Levi T-Shirt, along with hair samples, blood stained clothing and dried blood samples ***." Defendant argues that because there was no indication as to the alleged owner of the clothing or items, no mention of any sizes, styles or manufacturers, and no explanation as to why the items might be evidence of a crime, the warrant authorized a general search.

Defendant points out that the clothing worn by the 140-pound Piest would be different in size than that worn by a 195-pound man. Defendant argues too that no distinguishing characteristics concerning the wallet to be seized were described in the warrant. We do not agree. The warrant described the color, style, and even the type of material used in each article of clothing described. The T-shirt and pants are even described as to the manufacturer—"Levi." That the wallet could have been described more particularly did not authorize the police to conduct a general search and thus render the warrant fatally defective.

Defendant contends that assuming, *arguendo*, that the search warrant was valid the scope of the search

was so broad as to constitute an impermissible general search. The inventory of the items seized listed 57 objects, only one of which, the blue jacket, was listed in the warrant. Two items, a receipt for film left to be developed at Nisson's drug store and a Maine West High School class ring, are of particular significance. It was learned that the receipt was in Piest's possession when he disappeared and the class ring was owned by John Szyc, who had been reported missing. The police photographed a television set in defendant's home, and it appeared to be similar to one which had been taken from Szyc's apartment.

The People contend that the items seized were in plain view and there was sufficient information in possession of the officers to support their conclusion that the ring and receipt in some manner connected defendant with Piest's disappearance.

We disagree that any improper seizure concerning the television set occurred since the television set was not seized. The taking of a photograph does not amount to seizure, and defendant advances no argument as to why the police acted improperly in photographing the television set. Concerning the Maine West High School ring, the police were aware, as indicated by the information contained in the complaint for search warrant, that Piest lived in Des Plaines, was 15 years of age, and that there was a high probability that he attended this high school. Although the ring did not bear Piest's initials, the police officer conducting the search may not have immediately noticed the initials on the ring, and, in any event, the police were aware, at this time, that defendant could very well be a habitual sex offender and that more than one victim could be involved. The film receipt which was found in a waste basket in defendant's home showed that film had been left for development at Nisson's Pharmacy and would tend to show that he had been in the

pharmacy. We find no error in the seizure of the photo-finishing receipt or the high school ring.

A search warrant issued on December 21, 1978, authorized the police to search defendant's home for the remains of the body of Robert Piest. The underlying complaint for the warrant, prepared by Lieutenant Kozenczak, basically reiterated the facts contained in the first complaint for search warrant and stated:

> "Recovered during that search [pursuant to the December 13th warrant] was a customer receipt #36119 from a film developing envelope with the name and address of Nisson's Pharmacy stamped on it in ink. Further investigation revealed that this receipt had last been in the possession of Robert Piest, immediately prior to the time he had disappeared."

The complaint also stated that Officer Robert Schultz had informed Lieutenant Kozenczak that he had been invited into defendant's home by defendant while on the surveillance unit assigned to watch defendant, and that while inside he detected "an odor similar to that of a putrified human body." Officer Schultz indicated that he had smelled the odor of at least 40 putrified human bodies and that the smell in defendant's home was similar. Defendant's first two arguments concerning this contention assumed the invalidity of the first warrant. Since we have held to the contrary, we need not address these issues. Defendant's third argument concerning this contention is that even assuming the validity of the December 13 search, the underlying complaint for the December 21 search warrant failed to satisfy the two-prong test of *Aguilar v. Texas* (1964), 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509.

Defendant makes two contentions concerning the showing of probable cause in the complaint for the search warrant. First, defendant notes that the complaint does not explain the basis for Lieutenant Kozenczak's conclusion that the photo-finishing receipt was on

Robert Piest's person at the time of his abduction. The testimony at the hearing on the motion to suppress showed that Des Plaines police officers had spoken with Kim Byers and that she had said that she was wearing Robert Piest's jacket when she filled out the photo-finishing envelope, ripped off the receipt, and placed it in the jacket pocket. She later returned the jacket to Piest, who put the jacket on before leaving the store. Defendant asserts that, because this information was not contained in the complaint, this court may not make reference to this information in determining whether the complaint established probable cause. Defendant also complains that Officer Schultz did not promptly notify Lieutenant Kozenczak about the smell of decaying flesh and this casts doubt on the veracity of Officer Schultz' conclusion.

We find that the complaint, when viewed as a whole, is sufficient, and the circuit court correctly refused to suppress the evidence seized as the result of the warrant's execution. We agree with defendant that evidence adduced at the suppression hearing may not be used to bolster the sufficiency of the complaint for warrant. We do not agree, however, that the fact that Officer Schultz waited some 40 hours before telling Lieutenant Kozenczak of the odor he detected while in defendant's home automatically invalidated the probative value of this evidence. The 40-hour delay in bringing this information to Lieutenant Kozenczak goes to the issue of the credibility of Officer Schultz, an issue for resolution by the circuit court, and not this court on review. We hold that the evidence of the smell of decaying flesh in defendant's home, discovery of a film receipt purportedly on the victim's person at the time he disappeared, and the reiterated facts contained in the first warrant, taken together, provide a sufficient basis for the circuit court to refuse to suppress the evidence seized as a result of the execution

of that warrant.

Defendant argues that the evidence obtained as a result of the searches executed pursuant to the final three warrants must be suppressed as fruits of the prior illegal searches. Because we have already determined that the prior searches were not illegal, this argument must fail.

Defendant next contends that two days before his arrest he asked a police officer, in the event of his arrest, to inform his attorney, and that the police officer's failure to communicate with defendant's attorney before questioning him violated his fifth and fourteenth amendment right to have counsel present at his interrogation. Defendant also contends that his first confession was not the product of a rational mind or a free will, and that his second confession and all statements subsequently made were the product of "ineffective advice" from his attorney to confess. Although no objections were made at trial to the admission of these confessions, defendant argues that the plain error rule should be invoked or, alternatively, that the failure to object is evidence of the incompetency of counsel.

Criteria for determining whether the doctrine of plain error should be invoked have been enunciated by this court, i.e., whether the evidence is closely balanced, or if the error is of such a magnitude that the accused is denied a fair and impartial trial. (People v. Szabo (1983), 94 Ill. 2d 327, 355.) We find here no reason to invoke the plain error doctrine. Defendant's supposed invocation of his right to counsel when talking to Officer Hackmeister was apparently no more than a request that the officer contact defendant's attorney when he was finally arrested, because defendant had received money from out of State to be used to post his bond. The record shows that defendant was in continuous contact with his attorneys during the days prior to his arrest and that on the

night before his arrest he had told his attorneys that he was responsible for 33 murders. Defendant was read his rights and had read and signed a waiver form given him by the Des Plaines police department. Nothing in the record supports defendant's contention that his confessions were not the product of a free and rational mind, and, moreover, failure to assert his objection at trial precluded the circuit court from making a record on this point so that this court could properly review such a contention. Nothing in the record supports defendant's contention that trial counsel encouraged him to confess, but even if defendant's attorneys had done so the night before he was arrested, such a decision on their part could easily be viewed as a legitimate defense tactic. Justice Jackson's observation that "any lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to police under any circumstances" (*Watts v. Indiana* (1949), 338 U.S. 49, 59, 93 L. Ed. 1801, 1809, 69 S. Ct. 1347, 1358) is inapplicable to this situation. If defendant had revealed to his attorneys any details whatsoever concerning the 33 murders, defendant's attorneys were aware that some 27 or so bodies were buried in the crawl space and in other parts of defendant's home and that the police were on the verge of uncovering these bodies. Moreover, defendant's attorneys would have been aware that the Des Plaines police had positively linked defendant to Robert Piest's disappearance and that further links between defendant's young former employees and their disappearances would be discovered. Under these circumstances it does not indicate incompetence on the part of defendant's attorneys that they concluded that an assertion of innocence would border on the ridiculous and that confessions might bolster a possible insanity defense. The fact that even the earlier newspaper accounts suggest that defendant had a significant mental disturbance supports the assertion that defend-

ant's attorneys could have immediately concluded that an insanity defense would be the most realistic defense in this case. In light of defense counsel's able representation of defendant throughout the trial proceedings, we reject the contention, made by appellate counsel, that trial counsel "abandoned [defendant] and rendered ineffective assistance of counsel ***."

Concerning the manner of selecting the jury at his trial, defendant contends that the court's questioning during *voir dire* was insufficient; that the jurors should have been sequestered during the time between their selection and the beginning of the trial; and that the *voir dire* should not have been conducted in open court. Defendant contends too that his counsel and the counsel for the prosecution should have been permitted to directly interrogate the prospective jurors instead of being required to rely upon the court's questioning; that he should have been permitted peremptory challenges in addition to the 20 permitted by statute; and that the court's questioning of the prospective jurors concerning their attitudes toward the death penalty produced a biased jury.

Defendant contends that the court's questioning was inadequate because it did not sufficiently explore the prospective jurors' exposure to news accounts of the case. Defendant cites a number of instances which he asserts show that questioning on this topic was insufficient. As pointed out by the People, however, the circuit court announced at the outset of the questioning that counsel, if they felt it was necessary, would be permitted to request more questions on specific topics during questioning of a prospective juror. Defendant has listed only one instance where his request for additional specific questions on exposure to news accounts was denied. In that instance, defendant requested that the court ask a prospective juror "what he remembers out of the news-

papers *** what he remembers specifically out of the newspapers and radio." We find that while the court might properly have made such an inquiry, it was not required to do so because the court questioned the prospective juror sufficiently as to the sources from which he had learned of the case, and whether he had formed an opinion from these sources and from persons who may have expressed opinions about the case. The prospective juror stated that from what he had heard and seen he did not come to the conclusion that defendant had committed the offenses in question. On these facts, in view of the discretion vested in the circuit court in the examination of jurors, we find no reversible error. (*People v. Moretti* (1955), 6 Ill. 2d 494, 532.) It should be noted that in each of the other references to the record that defendant contends show insufficient questioning on this matter, defendant was given an opportunity to suggest further questions when the court had completed its interrogation, and failed to do so. Defendant did suggest questions on other subjects for the court to ask, and these were generally pursued. In certain of the instances cited by defendant, further questioning was unnecessary because those jurors were excused for cause.

Defendant's next disagreement with the court's questioning concerns the prospective jurors' opinions as to defendant's guilt. The record shows that defendant was given the opportunity to request that the court ask specific questions as to the prospective jurors' opinions of the guilt of defendant. Defendant complains of the questioning of Mrs. Loudenback, a prospective juror, but the record shows that after she was questioned by the court, the court inquired if there were further questions and defense counsel replied that he had "no more questions." In other instances cited by defendant, no error was committed because counsel was given the opportu-

nity to suggest additional questions concerning the potential jurors' opinions as to defendant's guilt and failed to do so, or the juror was excused for cause.

Defendant's next objection to the circuit court's questioning of prospective jurors concerns the insanity defense. Defendant complains of the colloquy between the judge and the first prospective juror. The record shows that when defense counsel protested the inadequacy of the questioning the court asked a number of additional questions. Defendant challenged the juror for cause on the ground that he had a preconceived predetermined opinion on the question of defendant's insanity but counsel proposed no additional questions to be asked of the juror. Simply stated, defendant's complaint concerning the questioning of the panel is that it was done "in such a way as to hide the jurors' biases rather than reveal them." The purpose of the circuit court's questioning was to enable the attorneys to exercise their peremptory challenges intelligently, and to determine whether a juror should be excused for cause. The record shows that the circuit court's questioning of this prospective juror was sufficient to fulfill both these purposes. We have reviewed the other portions of the record cited by defendant in support of his argument that the circuit court's questioning was insufficient. In most of these cited instances, defense counsel did not suggest additional questions to be asked of the prospective jurors. In certain instances, where defense counsel asked the court to question the prospective jurors further on the insanity defense, the court did so. On this record, defendant cannot complain that the questioning was insufficient to permit him to challenge jurors for cause or to exercise his peremptory challenges.

Defendant contends next that the circuit court did not adequately question the prospective jurors concerning their attitude toward homosexuality. Our review of

the instances cited by defendant shows that with every prospective juror defendant had the opportunity to tender specific questions and failed to do so. In the example cited by defendant, counsel did not tender a specific question, but asked the circuit court to inquire generally about the prospective juror's feelings toward homosexuality. Under the circumstances the court's refusal to do so was within its discretion.

Defendant's next disagreement with the manner in which the *voir dire* was conducted concerns the court's questioning on the prospective jurors' attitudes toward the death penalty. Defendant complains that the questions concerning the death penalty, as they were reframed after the interrogation of the first 15 jurors, made it much less likely that a prospective juror would reveal that he strongly favored the imposition of the death penalty. While we agree that the questions asked of the later jurors allowed for shorter responses, we do not find in the record any questions tendered by defense counsel that might have elicited a more thorough response. In the first example of the revised questioning used by the circuit court of which defendant now complains, when the *voir dire* of this juror was completed, defense counsel was asked if he had any further questions and responded that he did not. In the other instance cited by defendant, the prospective juror was excused for cause, so no error could have been committed in his questioning. Therefore, we hold that defendant waived his opportunity to discover more about the prospective jurors' attitudes about the death penalty by failing to tender additional questions during the *voir dire*. We also note that no questions concerning the death penalty appear in defense counsel's list of questions submitted to the circuit court prior to *voir dire*.

Defendant next complains that the circuit court failed to inquire further of prospective jurors who mentioned

that other jurors had been discussing the case. The record reveals, however, that defense counsel only requested that the court ask the prospective jurors what they knew of other jurors' opinions about the case. The circuit court's response was that the prospective jurors themselves would reveal their own opinions during *voir dire*. We cannot say that the circuit court abused its discretion by proceeding in this manner. The court was under no obligation to question the prospective jurors further upon hearing that they had merely heard other prospective jurors discussing the case. The cases cited by defendant in this regard are distinguishable. In *People v. Cravens* (1941), 375 Ill. 495, the trial court was given information after a trial that one of the jurors, who had become foreman of the jury, knew the defendant previously and had already concluded that he was guilty. During the *voir dire* of that trial, this same juror stated that he knew nothing about the defendant and had not expressed any opinion as to his guilt or innocence. On those facts, the defendant was granted a new trial. It is not contended here that any of the prospective jurors deceived the court, but only that more information should have been obtained concerning their opinions of the case. As previously noted, defendant was permitted to propose additional questions if he believed the *voir dire* insufficient, but has cited no instance where specific questions were proposed and rejected by the court. In *People v. Peterson* (1973), 15 Ill. App. 3d 110, cited by defendant, the circuit court received information just before trial that one of the jurors had expressed her opinion that the defendant should plead guilty so that the jurors could go home. Defendant has cited no instance of failure to excuse for cause a prospective juror with a preconceived opinion but contends that the circuit court did not question the prospective jurors sufficiently to discover such opinions. Defendant's failure to suggest specific ques-

tions to be asked of prospective jurors to elicit such preconceived opinions leaves us with nothing to review.

Defendant contends next that the failure to sequester the jury between the time of their selection and the beginning of trial denied him his right to a fair and impartial jury. Defendant complains that this procedure allowed the jurors to be exposed to media coverage of the case, and to discuss the case with their family members and friends. The People correctly point out that defendant neither moved to sequester the jury over this time, nor later asked for a mistrial, nor was it shown that any prejudicial media coverage occurred during the time in question. We also note that immediate sequestration would have placed a great burden on the jurors, who may have been able to use the week to organize their personal affairs before leaving town for a lengthy trial. As noted by the People, placing a greater burden on the jurors may have angered them, and the defendant might well have been the most likely target for their anger. (See *United States v. Haldeman* (D.C. Cir. 1976), 559 F.2d 31, 85.) For this reason, defense counsel may have decided as a tactical matter not to ask that the jury be sequestered before trial.

Defendant contends next that the extensive publicity surrounding his trial made it imperative that the *voir dire* be closed to the public. Defendant argues that the extensive publicity caused many prospective jurors to be hesitant to answer questions completely and truthfully. Defendant also contends that the news media, permitted to attend the *voir dire,* could reveal the questions leading to excusal of jurors, thus enabling prospective jurors to learn of these questions and formulate answers which would either avoid or require their own excusal. We note first that defendant did not request the public be excluded from *voir dire* proceedings until after a number of jurors had already been questioned. When defendant

did ask that the remainder of the *voir dire* be closed to the public, he did so only on the bare assertion that prospective jurors were not being fully candid. The Supreme Court has held that the press and general public have a constitutional right of access to criminal trials. (*Globe Newspaper Co. v. Superior Court* (1982), 457 U.S. 596, 603, 73 L. Ed. 2d 248, 255, 102 S. Ct. 2613, 2618; *Richmond Newspapers, Inc. v. Virginia* (1980), 448 U.S. 555, · 558-81, 65 L. Ed. 2d 973, 978-92, 100 S. Ct. 2814, 2818-30 (plurality opinion).) This right is not without limits (see *Press-Enterprise Co. v. Superior Court* (1984), 464 U.S. 501, 78 L. Ed. 2d 629, 104 S. Ct. 819), and defendant has not shown a sufficient basis upon which to invoke a limitation to that right. While it is true that prospective jurors may be reluctant to discuss their attitudes towards homosexuality, or prior dealings with the criminal justice system, this danger may exist in any *voir dire,* and the presence of the news media was not reason enough to close the proceedings to the public. While the sixth amendment guarantees the accused a right to a public trial, it does not give a right to a private trial. (*Gannett Co. v. DePasquale* (1979), 443 U.S. 368, 382, 61 L. Ed. 2d 608, 623, 99 S. Ct. 2898, 2907.) To close the proceedings to the public requires a more compelling reason than was shown to exist here. *Richmond Newspapers, Inc. v. Virginia* (1980), 448 U.S. 555, 580-81, 65 L. Ed. 2d 973, 991-92, 100 S. Ct. 2814, 2828-30.

Defendant contends next that the circuit court's refusal to permit the attorneys to ask questions during *voir dire* denied him due process of law and the right to a fair and impartial jury. Our Rule 234 states that "[t]he court shall conduct the *voir dire* examination of prospective jurors." (87 Ill. 2d R. 234.) In *People v. Jackson* (1977), 69 Ill. 2d 252, 260, we held that while a defendant has a right to trial by an impartial jury, that right

does not require that the parties themselves be permitted to interrogate the jurors. Defendant cites *Silverthorne v. United States* (9th Cir. 1968), 400 F.2d 627, in support of his contention that, when a case has received extensive pretrial publicity, the attorney should be permitted to interrogate the jurors. *Silverthorne* is distinguishable, however, since the trial court in that case failed to discuss the publicity issue individually with a number of the prospective jurors, and undertook little or no questioning of the jurors as to what they had heard or seen about the case. Here, the circuit court interrogated each juror individually as to the publicity issue, and asked detailed questions concerning the jurors' sources of information. The circuit court also permitted the attorneys to suggest additional questions when they felt the court's questioning was inadequate. In many instances, defendant had no other questions to ask of the jurors. Thus, on these facts we cannot say that the court abused its discretion by choosing to personally interrogate the jurors.

Defendant also complains that he should have been permitted more than the 20 peremptory challenges allowed by statute. We note first that defendant did not exhaust the peremptory challenges that he was given. (Ill. Rev. Stat. 1977, ch. 38, par. 115—4(e).) The only case cited by defendant in his brief in support of his contention is *People v. Speck* (1968), 41 Ill. 2d 177. That case is inapplicable, however, since the parties in that case agreed to give each side a higher number of peremptory challenges than allowed by statute. There was no error in limiting defendant to 20 peremptory challenges.

Defendant next complains that the examination of the prospective jurors on their attitudes toward the death penalty resulted in the selection of a jury which failed to represent a fair cross-section of the community and

which was biased in favor of the prosecution. Defendant admits that his argument on this point was rejected by this court in *People v. Lewis* (1981), 88 Ill. 2d 129, 146-47, and in *People v. Carlson* (1980), 79 Ill. 2d 564, 585-87. Having previously considered and rejected defendant's arguments, we decline to reconsider them here.

Defendant contends that because of the circuit court's refusal to provide funds for a publicity survey and a publicity analysis he was denied the right to a fair trial and the effective assistance of counsel. Before trial, defendant sought a change of venue and then moved for the appointment of a market research firm "to conduct a valid statistical survey both within and outside of Cook County to determine the effect of pretrial publicity on the temperament of those members of the community or communities who are potential veniremen for this cause." The circuit court told defense counsel that in order for the court to properly evaluate the motion, counsel needed a letter from the research firm explaining what the firm proposed to analyze and how such an analysis would be conducted. Defense counsel filed an amended supplemental motion with a "proposal for venue survey" as an appendix. The proposal was submitted by the National Jury Project and explained in detail the purpose of the survey and the manner in which it was to be conducted. In addition to determining the extent of exposure of potential jurors to news media coverage, the National Jury Project proposed to obtain information concerning "collateral prejudices" such as the potential jurors' attitudes on the issues of sexual preference, deviant behavior, and the "impaired mental state defense." The cost of the venue evaluation was estimated at approximately $38,000, although confining the survey to a limited number of counties and applying other cost-cutting measures could have reduced the budget. The supplemental motion was denied.

A publicity survey was performed by Editec, Inc. In addition, materials were submitted by the Chicago Sun-Times, the Chicago Tribune, Paddock Publications, and publishers from Winnebago, Champaign, Sangamon, and Peoria counties. Dr. Richard Ney, a psychologist, was called to interpret the data contained in the survey and the material gathered from the press and electronic media. Dr. Ney explained that there were a number of factors that should be considered in analyzing the effect which publicity has on a particular geographical location. The first factor was sheer volume. The more articles and news reports disseminated in a particular location, the more likely that area's inhabitants would recall the event.

Dr. Ney explained that the second factor to be analyzed in determining the impact of media coverage is the emotional impact created by certain types of articles. Six types of articles generate strong emotional responses. First, articles which made reference to "homosexuality" elicited emotional responses. Second, pairing homosexuality with the term "mass murderer" had a strong emotional impact because it combined the number of deaths with the "topic of death." The two Chicago newspapers carried many of these first two types of articles when the story first broke, but discontinued them a week to a month later. Third, "human interest" stories focused on an individual's involvement in the case rather than the actual facts of the case. Human interest stories were particularly prevalent in the Chicago area, but not in the outlying counties. Fourth, certain articles compared defendant to other notorious mass murderers. These articles were labeled "guilt by association" articles. Fifth, articles labeled "quasi-legal" articles spoke of how a defendant could "beat the rap" by using the insanity defense to avoid criminal responsibility. While such articles purportedly dealt with legal issues, they were loaded

with emotional terms and tended to bias the reader towards the view point of the writer. Sixth, articles labeled "local interest" articles described the particular impact defendant's case would have on the people of Cook County, such as the cost of trying him and providing for his defense. Dr. Ney explained that in all these categories, there was "more of this type of emotionally impacting material" in Cook County than in any of the other outlying counties. Dr. Ney explained that people in other counties would know about the case, but that there would be a difference in the type of material by which they received the information concerning defendant's crimes.

Another factor to be considered was reports of statements made by public officials. Statements made by public officials carried more weight because readers recognized the status associated with that public official's office. The fourth factor to be considered was the use of headlines. The larger the headline, the more important a reader would believe the information contained in the article was. Also, the type of material contained in the headline would have a significant impact on the reader. For example, instead of stating "33 boys slain" in a headline, the Cook County news media would use a day-by-day "body count," such as "bodies of 3 teens found, 29 more are feared slain." Again, in both these areas the impact in Cook County was much greater than in the other counties of the State.

Dr. Ney identified four principles which could be used to gauge the effect these factors had on the reading audiences exposed to these materials. The first principle was the "primary-recency effect," or the concept that the news best remembered was that first received and most recently received. The second effect was the "halo" effect, or the concept that the manner in which information is presented could affect the reader's under-

standing of that information's content. For example, referring to defendant as an "admitted homosexual" could give the reader a negative attitude towards the defendant which could make it difficult for that reader to objectively view the remaining information contained in the article. The third principle was called "the law of proximity" and basically means that two concepts, when placed in close proximity, will be viewed as a psychological unit. Thus, when an article appeared with a headline reading "A killer goes free, how can it happen?" and a picture of the defense attorney appeared below the headline, the reader would associate the defense attorney as one who freed killers, regardless of whether the article made such an assertion. The final principle, which is actually a series of principles listed under one heading, Dr. Ney labeled the "cognitive memory theory." Under this theory, information which is associated with a strong emotional response is much more easily remembered than information which does not evoke a particular emotional response. Thus, memories concerning bizarre behavior, violent crime, or sex are retained longer than information concerning nonviolent crime or other less emotional events.

These principles, as applied to the media coverage in this case, Dr. Ney explained, each illustrated that the news media coverage in Cook County was much more prejudicial to defendant than in other counties. In particular, human interest stories appeared predominantly in the Cook County news media. The public in Cook County more easily identified with the crimes because the victims lived in the same area as they did and they recognized the public officials involved in the investigation. Also, because of the prejudicial nature of the articles printed in Cook County, such as the articles associating defendant's trial counsel as one who sets killers free, prospective Cook County jurors were more likely to have

prejudicial preconceived ideas about defendant's cause.

In arguing for a change of venue, defense counsel stressed that the defense had met its burden in showing that there was a reasonable likelihood of prejudice "in Cook County itself and nowhere else ***," that the violent publicity was "far greater" in Cook County than in the other five counties that were studied, and that the prejudicial impact of which Dr. Ney spoke existed in Cook County but not in the other five counties studied, and that "the feeling that Mr. Motta and I have gotten visiting other counties was that there is a knowledge of the case, but there is not the same pattern of deep-rooted prejudice against the defendant" as there was in Cook County. The court granted defense counsel's motion for change of venue, specifically finding that there was "a substantial decrease of publicity outside of Cook County, perhaps strikingly so," and that even though publicity would be generated in whatever county the jury selection was conducted, this was the best method of insuring a fair trial for defendant. The circuit court emphasized the emotional connection that the inhabitants of Cook County had with this case because of the type of publicity, *e.g.*, human interest stories and community interest stories, combined with the "particular community interest" in determining that the prejudicial impact of news reports required a change of venue. The jury was selected in Winnebago County and the trial was held before that jury in Cook County.

Defendant contends that he had insufficient information to determine whether Winnebago County had been unduly influenced by prejudicial publicity and that this constitutes reversible error. We disagree. While Dr. Ney did suggest that he had insufficient information to determine which of the five counties outside of Cook County had the least amount of prejudicial publicity, the reason for suggesting that Cook County's publicity was prejudi-

cial was that the crime occurred in Cook County. Citizens living in other counties, by definition, would not establish the emotional tie to the crimes based on geographical location and the belief that the crime was significant because it happened in their community. While Dr. Ney indicated that people in Illinois might relate to the crime to some degree because of the jurisdictional boundaries of Illinois, more so than, say, a citizen of Montana, it must be kept in mind that the case had to be tried in some community in the State of Illinois. (*People v. Speck* (1968), 41 Ill. 2d 177, 183.) Also, as was indicated during the hearing on this matter, if defendant was convicted of this crime, he would have been guilty of the greatest number of murders for which any one person had ever been convicted. Consequently, it was inevitable that news coverage would be significant in any part of the country.

Defendant had no right to be tried in the county which was most likely to be favorably disposed to defendant and his theory of defense. The contention that the circuit court was constitutionally mandated to provide funds for a study which would have "included a determination of the attitudes on the issues of sexual preference, deviant behavior, and the insanity defense" of the five major counties in Illinois is untenable. The right to a jury trial has been interpreted by the Supreme Court as the right to an impartial jury selected from a representative cross-section of the community. (*Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770.) But just as the People may not select a jury which is predisposed on a pertinent issue which will arise at trial, the defendant may not seek out a county in which prospective jurors will most likely be predisposed on the defenses which the defendant will raise. We agree with the People that the defendant's request was, in effect, an attempt to substitute public opinion polls for

the process of *voir dire*. We find no error in the circuit court's refusal to allow funds for this expenditure.

Defendant raises 14 issues concerning the presentation of his insanity defense to the jury. Because of the number of issues and because one of the contentions is that the People failed to prove beyond a reasonable doubt that defendant was sane at the time of the alleged offenses, a review of the evidence is necessary.

The People, in opening statement, reviewed the facts of the case as revealed by the investigation conducted by the Des Plaines police department and others and then described in detail several of the murders as recounted by defendant in his confessions. The assistant State's Attorney stressed that the confessions of defendant, as corroborated by physical evidence and the testimony of other witnesses, would show that defendant committed the murders because the victims were "an inconvenience to him" and that the murders were the results of premeditated and rational acts. The assistant State's Attorney urged the jurors to utilize their "common sense" while listening to the testimony of the expert witnesses who would testify in this case. Defense counsel also urged the jurors to use their common sense, and told them that the evidence would show that the acts of defendant were not those of a normal, rational person. Defense counsel stated that the evidence would demonstrate that defendant followed a pattern which showed "a profound, incredible obsession." Defense counsel stated: "We will hear a lot of evidence, great detail, that John Gacy went out in the evening, picked up boys, and these boys were all the same—in the same category; certain age group, certain body build, certain color hair, certain sexual preferences." Defense counsel stated that four psychiatrists would be called for the defense and that "[t]hese psychiatrists will testify that Mr. Gacy demonstrates a host of seemingly neurotic symptoms, ***

and will continue to be dangerous, he requires intensive psychiatric treatment within an institution for the rest of his life." Defense counsel also stated: "Those psychiatrists will testify that he was unable to fully and consciously control his acts, which are motivated by overwhelming and uncontrollable primitive drives." Defense counsel then proceeded to impugn the reputation of the psychiatrists who would testify for the People, calling Dr. Robert Reifman "a mechanic for the State," stating that Dr. James Cavanaugh had "an iron-clad inflexible bias," and that Dr. Jan Fawcett would testify on behalf of the People because defendant's cause was too unpopular for the doctor to associate himself with the defense. Defense counsel stated: "The defense of insanity is valid and it is the only defense that we could use here, because that is where the truth lies." Again, counsel stated that "this man belongs in a hospital for the rest of his life."

Witnesses testified that 29 bodies were recovered from the crawl space under defendant's home, under his driveway, and under his garage, and that five bodies were recovered from the Des Plaines River. Medical experts working for or in association with the Cook County medical examiner explained how identifications were made on the remains of these bodies and testified that one body, identified as body No. 9, had an incised area on the upper portion of the fifth rib and two incised areas on the left lateral of the sternum which were consistent with stab wounds. Six bodies were found with ligatures around their necks, and 13 bodies were found with foreign bodies in the posterior aspect of the mouth and throat. The official cause of death for those bodies with materials impacted in the mouth or the throat was "asphyxia due to suffocation," but it could not be determined medically whether the cloth was inserted before or after death. Several of the life and death witnesses

testified that the victims were not homosexuals, but had steady girl friends, had just begun to date girls, or had plans to marry.

Former business associates, friends, and employees of defendant testified concerning defendant's actions during the period when the murders were committed and shortly before his arrest. David Cram worked for defendant and moved in with him after defendant was divorced from his second wife. He testified that defendant told him that he had a degree in psychology, which he needed in order to more easily manipulate people. Defendant admitted that he was bisexual, that he was not a big drinker, and that he never "went crazy" when using drugs or alcohol, or both. Cram testified that defendant had him dig trenches in the crawl space, purportedly for drainage purposes, and that defendant had him spread lime throughout the crawl space to rid the crawl space of its pungent odor. Cram testified that he was with defendant after the police had executed the first search warrant and that when they returned to defendant's home, defendant asked Cram to check the crawl space. Cram refused, so defendant checked the space and appeared "shook up about it." Ronald Rhode, a cement contractor who worked with defendant, stated that shortly before defendant was arrested he told him: "Ron, I've been a bad boy *** I killed 30 people, give or take a few." Defendant told him that he had some doctors that "were on his side," and that he thought he would go free. Tony Antonucci also worked for defendant. He testified that defendant openly admitted that he was bisexual. He testified that defendant once asked him if he would engage in homosexual activity if it "meant his job." Antonucci testified that defendant once came over to his house to show him stag films. They began wrestling, and defendant managed to put handcuffs on Antonucci. Defendant then unbuttoned Antonucci's shirt

and unbuckled his pants and pulled them down to his knees. Defendant then left the room. Antonucci managed to get out of one of the cuffs, but pretended that he had not, and when defendant returned to the room Antonucci placed the handcuffs on defendant. Defendant then stated: "You're the only one that not only got out of the handcuffs, but put them on me." Antonucci stated that after defendant had been handcuffed he continued to speak to him in a rational manner. Michael Rossi also worked for defendant. Defendant had sold him a car previously owned by John Szyc, who was later discovered to be one of defendant's victims. Rossi testified that on December 21, 1978, he went over to Cram's house to drop off some of defendant's tools, and that while he was there defendant arrived. He stated that defendant was emotionally disturbed, acted very nervous, and was "breaking into tears." He stated to Cram and Rossi that on the preceding night he had confessed more than 30 killings to his lawyers. Rossi testified that he had helped dig trenches in the crawl space, and supervised newer employees who were directed to dig trenches in the crawl space. He stated that defendant was very sensitive about where the employees dug, and would place markers designating the specific area in which the trenches were to be dug. Rossi testified that defendant was not a heavy drinker, that he complained of his health often, told Rossi that he had leukemia and once experienced something that appeared to be a heart attack, but that his health never prevented his getting his work finished.

Several police officers and an assistant State's Attorney testified concerning defendant's confessions. Prior to his arrest, defendant had stated to the police officers who were following him that "clowns can get away with murder." Before his arrest, defendant unplugged the sump pump in his crawl space so that it would fill up with water and removed the ladder descending into the

crawl space. After confessing to the murders, defendant spoke of "four Johns" and told the police that he did not know all of the personalities. He told Detective Michael Albrecht: "Mike, I won't be in jail very long for this, I won't spend a day in jail for this." He described the murder of Robert Piest in some detail, and stated that after he had put the rope around Piest's neck he twisted it twice, but then the phone rang, so he went to answer the phone, and left Piest to die of suffocation. Apparently referring to one of his four personalities, defendant told police that "Jack does not like homosexuality." He told police that the victims had all sold their bodies for $20 and that they had killed themselves. Defendant told Investigator Bedoe that all of his victims had come to his house voluntarily, that all the murders concerned money, and that they all occurred in his house. In describing the disposal of Robert Piest's body, defendant told Investigator Bedoe that he had to make "two or three passes" at the bridge where he was going to throw the body in the river before the bridge was clear of other traffic. Investigator Bedoe testified on cross-examination that defendant openly admitted that he was bisexual, but expressed a tremendous fear of being a homosexual. Officer Phillip Bettiker testified that defendant said that Piest said that he would do almost anything for a great deal of money. Defendant used a rosary to demonstrate to Officer Bettiker and the other persons in the room at the time of the confession the "rope trick" that he used to strangle his victims. He stated that he did not have anal sex with Piest, but that "Jack might have." Defendant stated that he did not use the lime to speed up decomposition of the bodies, but rather used muriatic acid for this purpose. The lime was used, defendant explained, to sweeten the smell of the crawl space. After drawing a diagram of where the bodies were located in the crawl space, defendant put his hands over his face and stated:

"What's going on. Jack drew that diagram of the crawl space." Lawrence Finder, an assistant State's Attorney, testified that defendant was emphatic about the fact that there were no bodies buried underneath his driveway. At the time of his confession, the driveway was still intact. Later, a body was found buried underneath the driveway. Defendant admitted to some 1,500 homosexual relationships. Defendant stated that he killed "Joe from Elmwood Park" because he wanted more money for the sex act, and that he would tell defendant's neighbors that he was homosexually raped by defendant if he did not pay the extra money. Defendant stated that the killings became less frequent later on because he was working so hard, and he was too tired to "go cruising." Defendant described the killing of John Butkavitch, and stated that since Butkavitch threatened to kill him if he was released from his handcuffs, he killed Butkavitch instead. He stated that Greg Godzik had dug his own grave, and that he had killed John Szyc because he had asked for more money. Defendant told Finder that he usually killed his victims for one of two reasons: because the victim demanded more money than originally agreed upon or because they posed a threat to him by exposing his sexual preferences to his neighbors. Defendant explained that Robert Piest did not fit the pattern. He had handcuffed Piest after Piest had come to his house with him to discuss the possibility of employment. Defendant placed handcuffs on Piest, and then attempted to perform oral sex on him, but could not since Piest could not get an erection. Because Piest "became frightened" defendant worried that he might tell somebody what had happened, so he performed the "rope trick" on Piest. Defendant stated that only "Jack Hanley" knew why Piest's body was put into the river. Defendant explained that he would frequently stuff socks into the mouths of victims to prevent the blood coming through the mouth

after death from staining the floor. He stated that he had graves dug so that he would have graves available.

Defendant called two witnesses who described defendant's assaults upon them. Jeffrey Rignall testified that one night when he was walking to a local bar, defendant offered him a ride. Once inside the car, defendant placed a cloth soaked in chloroform over Rignall's face, causing him to lose consciousness. Defendant carried Rignall into his house and offered him a drink. Defendant appeared very relaxed. Defendant then chloroformed him again. When Rignall regained consciousness, he found himself restrained on a wooden board which was suspended by chains. The board had holes in it where his arms went through and where his head was placed. Defendant, who was naked, was standing directly in front of Rignall masturbating. Defendant then grabbed Rignall's head and shoved his penis into Rignall's mouth, shouting: "You love it, you love it," with a tone of voice used by a drill instructor. Rignall lost consciousness several more times, and when he regained consciousness defendant shoved an unidentified object into Rignall's rectum. He repeatedly stated, "You love it," talked in obscenities, and "made it clear" to Rignall that defendant was in complete control. The next thing Rignall remembers is waking up, wearing only his blue jeans, next to a statue in a park near his home in Chicago. It was very cold outside. His face was scarred and swollen and he was bleeding from his rectum. Rignall testified that he was currently under psychiatric care and was also receiving treatments for his liver because the repeated use of chloroform had damaged his liver. Rignall was of the opinion that defendant was not legally sane at the time of this episode and stated that he reached this opinion "by the beastly and animalistic ways he attacked me." Michel Ried testified that he was a homosexual and met defendant in "New Town." After

a brief conversation, he and defendant engaged in sex for which defendant paid Ried. Ried testified that he was having difficult times financially, and that defendant gave him a job and allowed him to move in with him. One night in defendant's garage, which at the time was unlit, defendant told Ried to get some fuses which were under the work bench. As he did, defendant hit him with a hammer. Ried got up and saw that defendant had his arm cocked back as if he were going to strike again and had a "kind of strange" look in his eyes. Ried grabbed defendant's arm and asked him what he was doing. Defendant just looked at him, put the hammer down, and told Ried that he did not know what had come over him, but that he felt like he wanted to kill Ried. Defendant then "patched up" Ried's head. Ried stated that at the time of this incident he did not think defendant knew what he was doing. On cross-examination, Ried stated that he might have had an argument with defendant before this incident occurred. Several weeks earlier, defendant and Ried were attempting to break into a house and Ried saw defendant coming from behind him with a tire iron in his hand. When Ried turned around and saw him coming, defendant stopped and stated that he thought there might be trouble. Ried stated that, at the time of the incident with the hammer, he had not looked at defendant before defendant struck him.

Several members of defendant's family and childhood friends testified concerning defendant's past. Defendant's sister testified that their father was never pleased with defendant and told him that he would turn out to be a fairy, just like his friend, Barry. Defendant's sister stated that their father had a Dr. Jekyll and Mr. Hyde type personality. Their father would come home from work, lock himself in the basement, and drink. Often he would come back up and eat dinner with the family, but if anyone said anything that displeased him, he would

lunge across the table at them. The night before defendant's sister was to marry, defendant and his father got into an argument over whether or not defendant would take a bath that night. Defendant's father held defendant against the wall and said: "Hit me *** what's the matter with you? Are you a coward? *** Hit me. You will never stick up for yourself." Defendant's father tripped on a chair and fell, accused defendant of tripping him, and threatened to kill defendant. Defendant's sister stated that she once found silk underpants in defendant's bed, and that when she was five or six years old, defendant had taken his mother's underwear and put it underneath the porch. She testified that the basement was locked and the children were never permitted to go down there unless accompanied by a parent. She testified that on the night before her wedding, her husband-to-be said something which she could not remember, but that defendant became enraged and started attacking her husband-to-be. Defendant jumped out of the car in which they were riding and walked to their house, which was about a block away, and when she arrived home, defendant acted as if nothing had happened. She also testified to an incident where defendant was coming out of anesthesia and began thrashing around with "the strength of ten men." Defendant's mother, Marian Gacy, testified that defendant was an unhealthy baby and was not expected to live. She confirmed the incident where defendant took her silk underwear and hid it beneath the porch. She described an incident when defendant was approximately two years old where the father, for no apparent reason, punched her in the face, knocking out her bridge and causing her to bleed profusely. The father left, and when the police arrived they advised them to leave the home for a few days until things calmed down. When they returned, the father came home, ate dinner, and acted as if nothing happened. She described an inci-

dent where defendant apparently had had some type of seizure, and when he was revived he was fighting and kicking like a madman. Because defendant repeatedly passed out at school, he was told by Dr. John Cavanaugh that he should be sent to Cook County Hospital for psychiatric evaluation. Defendant told her: "Mom, don't send me to the psychiatric ward. I will be good." So she did not. She testified that her husband would go down to the basement and drink after work, and that he would talk to himself in two different tones of voice. She testified that her husband was very critical of defendant and never showed any affection towards him.

Carol Loftren, defendant's second wife, testified that she found silk bikini underwear, which were stained in front, lying around the house. She stated that defendant never hid the fact that he was bisexual. She said defendant was a gentle lover, but that throughout the marriage they had increasingly less sex, until one day defendant stated that this would be the last day that they had sex together. After they were divorced, they met in Wisconsin. At this time they tried to make love, but defendant began crying. Defendant "couldn't do anything" and "said he was afraid he was going more the other way." She stated that, one night when she could not sleep, defendant came home and was startled to find her up watching television. Defendant then stated he had come into the house to get something, but left with nothing, and when she looked through the curtains she saw a young boy with blond hair get into the car. Defendant then drove off. She went out to the garage and discovered a blanket on the floor, and a red light and a mirror on the wall. She testified that during the marriage she had complained of the terrible smell emanating from the crawl space; that one time she went away for a few days, and when she returned the smell had gone, and defendant stated that he had poured concrete in the

crawl space. She stated that defendant had a memory like an elephant and would be surprised if defendant ever forgot a face or a name. She stated that defendant planned to one day completely cement over the crawl space.

John Lucas, a gas station owner, testified that he serviced defendant's vehicles. He stated that, shortly before he was arrested, defendant came into the gas station and passed a bag with three rolled cigarettes to one of his employees. The employee showed Lucas the bag, and Lucas immediately turned the bag over to one of the policemen on the surveillance unit who was standing within 10 to 15 feet of them. Oscar Pernell, a prison guard, testified that one night after defendant was incarcerated, he saw him writing a letter. Two or three hours later, Pernell saw defendant lying underneath the bed with a towel wrapped around his neck. Pernell could not remember whether the towel was knotted or not, but he testified that no harm was done to defendant.

Other witnesses testified that defendant was boastful but not antisocial, that he was not a heavy drinker, and that he often had complained of physical ailments which did not appear to exist.

Two psychologists and two psychiatrists testified on behalf of defendant. Thomas Eliseo, a clinical psychologist, testified that defendant scored in the top 10% of the population on the Wechsler scale and had no major brain damage. However, he had confused thinking which "resembles to a large extent people who would be classified as schizophrenic ***." He diagnosed defendant as having borderline schizophrenia or borderline personality. When asked his opinion as to whether he was legally sane under Illinois standards, the People objected and a side bar was had. Outside the presence of the jury, it was established that Dr. Eliseo had not attempted to verify any of the facts that defendant had told him, read

the police reports, talked to any of the people involved, or read any of the reports of the other psychologists or psychiatrists. It was explained that defense counsel had asked him not to review these materials so that the doctor could give "an independent evaluation." The circuit court ruled that Dr. Eliseo could not base his opinion on defendant's statements, but Dr. Eliseo was allowed to answer a hypothetical question which included most of the pertinent facts concerning defendant's life which were shown by lay witnesses and defendant's confessions. Based on the facts and the hypothetical question, Dr. Eliseo stated that defendant suffered from a mental disease, paranoid schizophrenia, that this condition existed continuously and uninterruptedly in defendant between January 1, 1972, and December 21, 1978, and that because of this mental disease he lacked the substantial capacity to conform his conduct to the requirements of the law and appreciate the criminality of his conduct. On cross-examination, Dr. Eliseo stated that after defendant had committed the crime, he would understand that what he did was wrong, but at the times of committing the crimes, he was not aware of the criminality of his act. When asked how he could determine from one interview whether defendant was psychotic at certain points in time, Dr. Eliseo stated that he would determine the general personality characteristics and structure of defendant and then "project back. It is a guess." On further redirect examination, Dr. Eliseo was allowed to answer, in narrative form, the question: "Would you explain exactly how you came to the decision or opinion that the condition of paranoid schizophrenia existed for the last six, eight years?"

Dr. Lawrence Freedman reviewed all the police reports, all of defendant's statements, newspaper articles from the very inception of the case, defendant's criminal history, the reports from other psychiatrists and psychol-

ogists, and the book Jeffrey Rignall wrote concerning defendant's assault upon him. Dr. Freedman spent more than 50 hours examining defendant. Dr. Freedman also interviewed defendant's younger sister and his mother and spoke with the interviewers who were attempting to contact defendant's friends and neighbors. He reviewed all of the medical reports on defendant. Dr. Freedman diagnosed defendant as a pseudo-neurotic paranoid schizophrenic. Dr. Freedman explained that defendant had a psychotic core, but that this psychotic core was concealed by defense mechanisms which resemble neuroses. Dr. Freedman opined that defendant had neurotic and psychosomatic illnesses from early childhood, and that the shift from a serious neurosis to the beginnings of a psychosis probably occurred about the time of Christmas of 1969 when he was incarcerated at Anamosa for sodomy, and his father died and defendant was unable to go to his father's funeral. Defendant, Freedman explained, was at a very low point in his life, as he was a failure as his father had always predicted, and he would no longer be able to redeem himself. Dr. Freedman explained that during the homosexual encounters with his victims, he projected his own anxieties about himself onto his victims, thinking that they, and not he, were "trash." He stated that all the boys were in a certain age group and of a certain build because these boys represented the fit and trim build he was unable to attain as a youth. Dr. Freedman testified that his diagnosis was consistent with a diagnosis of borderline personality and that the schizophrenic process was at the borderline and "breaks out in flowered symptomatology from time to time when the stress gets too high." On cross-examination, Dr. Freedman stated that defendant could not control when the outcroppings would occur. When asked why these "outcroppings" only occurred at night and when no one else was around, Dr. Freedman explained that these

hours were the hours in which boy prostitution flourished, defendant was engaged in other activities during the rest of the day, and that defendant "was, in fact, concerned with not being detected." Dr. Freedman declined to give an opinion as to whether defendant was legally insane at the time of the murders, explaining that he believed the Illinois definition of sanity called for a legal conclusion, not a psychiatric conclusion.

Dr. Robert Traisman, a clinical psychologist, spent 3½ hours examining defendant and several more hours reviewing the results of the tests he administered to defendant. Dr. Traisman administered the Wechsler adult intelligence scale, the Bender-Gestalt visual motor test, the Rorschach ink blot test, the Draw-a-Person test, and the Thematic Apperception test on request by Dr. Richard Rappaport. Traisman noted that there was an unusual and significant disparity between defendant's verbal and nonverbal scores on the Wechsler test. Defendant's responses to the Rorschach test, Dr. Traisman explained, indicated that he was a paranoid schizophrenic who had homosexual conflicts, marked feelings of masculine inadequacy, a lack of feeling for other people, and an alarming lack of emotional control or ego control when under stress. Dr. Traisman noted that the defendant saw flowers in many of the ink blots and birds or insects which were entering in to siphon the pollen, a response which was inappropriate to the card. Dr. Traisman explained defendant's responses to the Thematic Apperception test and the Draw-a-Person test and explained how defendant's responses were consistent with his finding concerning the Rorschach test. For example, on the Draw-a-Person test, defendant was told he could draw anything he wished, and he drew his house in great detail. On cross-examination, Dr. Traisman agreed that it would be correct to say that defendant was a very severely disturbed man "but who reflects sufficient

awareness of. any aggressive destructive behavior \*\*\* [and] \*\*\* knows the nature of any antisocial acts he might perform and \*\*\* would be quite cognizant of whether or not they are right or wrong on a moral level." On redirect examination Dr. Traisman stated that because of defendant's paranoid schizophrenia, he had a minimal amount of control over his actions and that his disease "is related to the acting out and loss of control \*\*\* ."

Dr. Richard Rappaport, a psychiatrist, testified that defendant was "borderline" with the psychosexual disorders of fetishism, homosexuality, sexual sadism, and necrophilia. The "subtypes" of narcissistic and antisocial borderline personalities were also part of the same characterization. Dr. Rappaport testified that defendant would have brief psychotic episodes which would occur as a result of rage where "he thought these boys were him and he was the father" and the unmanageable rage he felt was actually against himself. Dr. Rappaport theorized that defendant placed the bodies in the basement because his father had placed "his junk or \*\*\* paraphernalia" down in the basement. Dr. Rappaport testified that defendant was sufficiently in touch with reality so that he realized that "he had to provide for his habits, he had to provide a receptacle for getting rid of these [shells] of people." On cross-examination, he stated that he used the psychoanalytic approach in examining patients and that there are a significant number of psychiatrists who neither use nor place reliance in this approach. When asked how to reconcile the fact that the last five bodies were thrown into the Des Plaines River with his theory that the dead bodies were "love objects," Dr. Rappaport conceded that this was difficult to explain, but that there would be some explanation that he had not yet come to understand. He stated that he did not believe that there was not a psychoanalytic answer

for the 33 murders committed by defendant. When asked whether defendant's explanations of why he murdered the victims, *e.g.*, because they asked for more money or threatened to reveal his homosexuality, were inconsistent with the theory of projection espoused by Dr. Freedman and Dr. Rappaport, Dr. Rappaport stated defendant may have "imposed those ideas on the individuals" or "tried to elicit behavior on their part to conform to his idea that they were bad people. That was part of the projective identification that I was explaining before." Dr. Rappaport consulted with Dr. Cornelia Wilbur, a known authority in the field of multiple personalities, and she confirmed his conclusion that this was not a case of multiple personality. Dr. Rappaport believed defendant spoke of "Jack Hanley" as an alias. On cross-examination, it was brought out that after these intense expressions of hostility, defendant could justify his behavior as conforming to his private code of morality, even though he recognized that his behavior would not be considered socially acceptable. He stated that defendant's antisocial personality helped him forget his criminal acts.

In rebuttal, the State presented witnesses who testified to homosexual attacks and encounters with defendant while he was living in Iowa. R. E. Schroeder testified that defendant had hired him to beat up Donald Vorhees, defendant's Iowa sodomy victim, so that he would not testify in court against defendant. Richard Westphal, who worked for defendant when defendant was the manager of several Kentucky Fried Chicken stores in Iowa, testified that defendant allowed him to sleep over at his home one night, that defendant told him he could sleep with his wife in exchange for a "blow job," that defendant's first wife came in to the room where he was sleeping and made love to him, and that defendant walked in and stated, "See, I caught you, now

you owe me a blow job." Defendant then forced Westphal to comply with the agreement. Edward Lynch, a classmate of Donald Vorhees, testified that while he was at defendant's house in Iowa defendant threatened him with a carving knife and forced him into his bedroom. Lynch overpowered defendant, and defendant became very apologetic, bandaged Lynch's cut, and talked Lynch into watching a "stag film" downstairs. While watching the movies in the basement, defendant said, "Let me try something," and chained Lynch's hands behind his back. He then moved behind Lynch, forced him onto a nearby mattress, and choked him until he stopped moving. While Lynch was lying still, defendant rolled him onto his side, and unlocked his hands. When Lynch got up, defendant said, "Well, are you okay?" and then at Lynch's request, took him home.

The People presented several witnesses who described defendant's conduct while incarcerated at Anamosa in Iowa. These witnesses testified that defendant functioned very well while in prison, that he was able to attain positions of importance in organizations such as the prison chapter of the Jaycees, and, because of his work in the prison's kitchen, was able to trade food for favors. Defendant told his counselor, and other inmates, that he was in prison for showing porno films to adolescents, and showed disdain for homosexuals. These witnesses also recounted that defendant experienced episodes of what appeared to be heart attacks.

Steve Pottinger, a former friend of defendant's from Waterloo, Iowa, testified that there was no change in defendant's behavior before and after he was in the penitentiary. Charles Hill, another friend from Waterloo, Iowa, testified that while defendant was in prison he vigorously professed innocence to the crimes with which he was charged, and when he was released stated, "I'll never go back to jail."

Robert Donnelly testified that he was walking in Chicago when defendant approached him in his black car (which had spotlights on both sides) and asked for identification. Thinking that defendant was a policeman, Donnelly approached the car. Defendant threatened Donnelly with a gun and told him to get into the car. Donnelly was then handcuffed and told to lie on the floor of the car. Defendant brought Donnelly into his home, into a room which had a bar, and told Donnelly that "he was an important person" and that "still he didn't get the respect he deserved ***." Defendant offered Donnelly a drink, and when Donnelly refused, defendant threw the drink in his face. Defendant later offered another drink, which Donnelly refused, and defendant told him that he was a guest and that he should accept defendant's hospitality, and then held Donnelly's mouth open and poured the drink down his throat. Defendant then took the handcuffs off, asked Donnelly for his wallet, examined the wallet, and then told him to put the handcuffs back on. After he did, defendant slapped Donnelly with the back of his hand, shoved Donnelly on the couch, and grabbed his hair. When Donnelly screamed, defendant pushed his face into the couch. He then removed Donnelly's pants and anally raped him. Donnelly passed out. When he regained consciousness, defendant took him into the bathroom, shoved Donnelly's head against the wall, then placed something around Donnelly's neck and started twisting it. He told Donnelly, "My, aren't we having fun tonight?" He then forced Donnelly's head into the bathtub, which was filled with water, and held it there until Donnelly passed out. When Donnelly regained consciousness, he discovered that his clothes had been removed and the handcuffs had been moved so that his hands were now cuffed behind his back. Defendant held Donnelly's head under water again until he passed out, and when he regained consciousness he repeated this

procedure once more. When Donnelly again regained consciousness, defendant urinated all over Donnelly. He then showed Donnelly nude magazine pictures of girls, asked him if he liked them, and when Donnelly said yes, told Donnelly that he was sick. Defendant then punched Donnelly, and once again held his head in the bathtub until he passed out. When Donnelly again regained consciousness, defendant picked him up from the bathroom floor and brought him back into the room with the bar. He said, "You're just in time for the late show" and turned on a projector and showed a "gay" pornographic film on the wall of the room. After the movie, defendant stuck his foot in Donnelly's stomach, put a gun to Donnelly's head, and played "Russian roulette." He pulled the trigger between 10 and 15 times, spinning the chamber between pulls of the trigger, until the gun finally went off. The gun contained a blank. Defendant told Donnelly that he had killed girls before, but that he had stopped doing this, because he found killing "guys" to be more interesting. He then choked Donnelly until he lost consciousness. When Donnelly regained consciousness, his hands were cuffed behind his back, his ankles were bound, and there was a gag in his mouth. Defendant then inserted some sort of object into Donnelly's rectum and he passed out. When he regained consciousness, the object that was placed in his rectum was still there. When Donnelly regained consciousness, defendant removed the gag from Donnelly's mouth and Donnelly told him that if he was going to kill him, to just do it and get it over with. Defendant placed the gag back in Donnelly's mouth, and started "playing around with" the object which was inserted in Donnelly's rectum. Defendant then told Donnelly to dress, put Donnelly in his car, and told him it would be his last ride. He asked Donnelly "How's it feel knowing that you're going to die?" but then released Donnelly near Marshall Field's, where

Donnelly worked. He told Donnelly that he was going to die later, but not to tell anyone, because they would not believe him.

Officer Ted Janus was assigned to Donnelly's case. When Janus arrested defendant, he advised him that he was under arrest for kidnaping and deviate sexual assault. At Area 6 police headquarters, after twice being advised of his rights, defendant told Janus that he had offered Donnelly a ride, that while riding together the conversation turned to performing sex acts for money, to which Donnelly agreed, that they went to defendant's house, performed "slavery sex" "where they bound each other with handcuffs and chains, watched pornographic movies, committed acts of deviate sexual assault upon each other and used candles and dildos, also." Defendant told Janus that he then drove Donnelly to Marshall Field's, his place of employment, but did not pay Donnelly the money.

The People's experts all testified that defendant was suffering only from a personality defect, that he was never psychotic, and that he was legally responsible for his criminal acts under the Illinois standard.

Dr. Leonard Heston, currently Professor of Clinical Psychiatry at the University of Minnesota, testified that while at the University of Iowa he examined defendant in 1968 pursuant to court order issued on a joint application of defendant and the State of Iowa. At that time he was diagnosed as having antisocial personality. Dr. Heston opined that the diagnosis "pseudo-neurotic paranoid schizophrenic" was not a recognized diagnosis and "is not taken very seriously right now." Dr. Heston found that there was "grossly insufficient evidence to support" the psychoanalytic scenario concerning how defendant "went about committing these killings," and that the diagnosis of paranoid schizophrenic was based on "pure inference." Even assuming that Dr. Freedman's clinical

findings were correct, Dr. Heston explained, Dr. Heston still would not be able to conclude that defendant could not conform his conduct to the requirements of law, because he was unable to find a causal link. He testified that "borderline" appeared for the first time in psychiatric nomenclature in Diagnostic Statistical Manual III (DSM III), that the diagnosis was quite controversial, and that "it is our single outstanding problem." He stated that the purpose of DSM III is to allow psychiatrists to understand each other. He testified that the problem with psychoanalytic theory is that it requires an inference about mental processes which is not susceptible to proof. He explained that if the theory was correct, it should lead to treatments which work, but since effective treatments had not resulted from the theory, the theory was not correct.

Dr. A. Arthur Hartman, a clinical psychologist, was called to examine defendant by Dr. Robert Reifman, a psychiatrist, at the inception of the case due to the seriousness of the charges. He diagnosed defendant as having an antisocial personality. Dr. Reifman diagnosed defendant as having a personality disorder—narcissistic type. He explained that the description of narcissistic personality contains many of the elements of the antisocial personality, and that the antisocial personality is a subtype of narcissistic personality. Dr. Reifman explained that psychoanalysis was a theory of behavior, a form of research, and a form of treatment, but that it "is not related to legal responsibility at all." Dr. Reifman stated that defendant could not be a pseudoneurotic paranoid schizophrenic because if he had such a defect he would have so many symptoms that he would be "an extremely impaired person" and would be "bothered in every area of his life." He ruled out the possibility of 33 brief psychotic episodes because, "in each instance that I am aware of, at no time was Mr. Gacy out of touch with re-

ality." He explained that the process of tricking his victims into the handcuffs and tying intricate knots on the ligatures used for the "rope trick" required "cognition, thoughtfulness, reasonable behavior." Dr. Reifman did not believe that defendant's speech was characterized with "loose associations," but rather was the result of his overt lying. He stated that defendant was feigning being crazy, and attempted to fake a multiple personality defect. When asked on cross-examination whether defendant was indistinct or contradictory, Dr. Reifman replied: "He tries to obfuscate, or tries to present a picture that is not clear." Dr. Reifman explained that the difference between a diagnosis of antisocial personality and a diagnosis of narcissistic personality is the difference in emphasis, and that he found that the diagnosis of antisocial personality did not take into consideration defendant's accomplishments in other areas.

Dr. Richard Rogers, a clinical psychologist, administered the Schedule of Affective Disorders and Schizophrenia test (SADS) on defendant. He stated that this test was relatively new and not currently in widespread use, but that reliability studies showed that experts agreed on their diagnoses of the same patient 88% of the time. Dr. Rogers explained that in regard to the MMPI test administered by Dr. Eliseo, there was evidence that defendant was attempting to make himself look worse than he really was. Dr. Rogers testified that there were empirical studies which proved that the Draw-a-Person test does not work, and generally disparaged the interpretation of other test results which Dr. Traisman reached.

Dr. James Lewis Cavanaugh, a psychiatrist, testified that, when he went to interview defendant, defendant insisted that he sign a document which precluded the use of his notes by the court or by lawyers. Dr. Cavanaugh stated that this indicated a degree of sophistication, and

that defendant insisted that the experts had to play the game by his rules. He expressed the opinion that defendant was suffering from pervasive narcissism, with an obsessive compulsive quality, an antisocial quality, and a hypomaniac quality, all of which were components of his mixed personality disorder. Dr. Cavanaugh, who used an eclectic approach to psychiatry, believed that the psychoanalytic approach was useful in diagnosing the cause of a patient's problem, but that the approach was not useful in assessing criminal responsibility. Dr. Cavanaugh explained that the psychoanalytic approach was "highly deterministic" in that it is premised on the belief that certain types of behavior patterns, thoughts, feelings, or fantasies could be predicted by reconstruction of past experiences. Dr. Cavanaugh further explained that there was an inherent conflict between a determinant psychological theory which explains everything on the basis of a person's earlier development and a legal system premised on the concept of free will. Legally, Dr. Cavanaugh explained, a person could escape responsibility only when "an extreme situation arises" where the person's ability to form an intent is questioned. Dr. Cavanaugh ruled out the possibility of schizophrenia because defendant's general level of functioning was too high and because "the sum total of his life up to this point in time" negated the existence of the basic elements of schizophrenia. On cross-examination, Dr. Cavanaugh explained that he had used psychoanalytic theory to explain the causes for defendant's behavior, and that defendant was suffering from a major psychiatric disorder. Dr. Cavanaugh expressed the opinion that defendant understood his behavior sufficiently to control it, or at least get help, but Dr. Cavanaugh conceded that defendant's ability to control his behavior was impaired in the sense that it was below that of the average person.

The defense called two other psychiatrists. Dr. Tobias

Brocher, a neurologist and a psychiatrist, agreed with Dr. Rappaport's theory that parts of defendant "split off" and he projected these bad parts onto his victims, and then destroyed the victims, believing he was doing a service to society by ridding it of "human trash." Because the "splitting off" process and projection of a repressed part is an unconscious process, Dr. Brocher opined, "My diagnosis proves the psychotic process because only persons who are psychotic can split off so far that they negate reality." Dr. Brocher did not state an opinion whether under Illinois standards defendant was responsible for his criminal acts. On cross-examination, Dr. Brocher was asked if he realized that the "reason for the motive that someone does something has nothing to do with [the Illinois] standard [for insanity]?" Dr. Brocher replied: "Well, that's maybe a legal viewpoint; it's not a psychiatric viewpoint, because in psychiatry you have to understand the motivation why somebody is doing something. Otherwise, he can't understand any kind of illness." When asked whether he agreed with the statement to the effect that psychiatrists do not belong in the courtroom because they could not function effectively in a courtroom, Dr. Brocher replied, "*** my experience *** convinced me the opposite is true, that most people in the legal profession don't understand psychiatry." Dr. Helen Morrison, a psychiatrist, diagnosed defendant as having a mixed psychosis or an atypical psychosis. Dr. Morrison believed that defendant suffers from psychological hallucinations where he would see parts of him which were split off in his victims. She was of the opinion that defendant was not legally responsible for his actions under the Illinois standard, and that defendant would have killed his victims even if a police officer had been present at the time of the murder.

In rebuttal, Dr. Jan Fawcett, a psychiatrist, also opined that the problem with psychodynamic or psy-

choanalytic theory in determining criminal responsibility is that it was used to explain behavior retrospectively as if no other outcome could occur. Additionally, he explained, the psychodynamic theory tends to be used as if it is actual fact when it is really inference and theory, and inferences or assumptions upon which psychodynamic theory is based do not in themselves explain an individual's behavior in the sense of causation. When questioned concerning Dr. Brocher's diagnosis, Dr. Fawcett explained why he disagreed with that diagnosis, and also explained that even if this diagnostic evaluation were to be accepted, there still was no causal relationship between his diagnostic theory and any possible inability of defendant to either appreciate the criminality of his conduct or conform his conduct to the requirements of law. When questioned concerning Dr. Morrison's diagnosis of atypical psychosis, Dr. Fawcett found no factual basis, and that the term "psychological hallucination," in his opinion, did not meet the criteria for the type of hallucination that is used in the criteria for the diagnosis of a psychosis.

Defendant contends that the People failed to prove beyond a reasonable doubt that defendant was sane at the time of the alleged offenses. Defendant argues that "the defense evidence on the sanity question was by and large consistent and credible, while the State's evidence was contradictory and unconvincing ***." Defendant, in his brief, examines at length both the expert and lay testimony concerning defendant's insanity defense and concludes that because all the defense experts arrived at consistent diagnoses, and the People's experts did not, the People failed to meet their burden.

The People argue that defendant has offered no evidence which raises a reasonable doubt as to his sanity at the time of the alleged crimes; "that even assuming that the issue was adequately raised, the proof of Gacy's san-

ity during the murders was overwhelming; and that as a matter of law, the jury's determination should not be disturbed."

There is little conflict in the evidence, and the question presented was what inference could appropriately be drawn therefrom. " 'The record presents a question of fact to be determined by *** [the fact finder]. Its decision will not be reversed unless the determination is so improbable or unsatisfactory as to raise a reasonable doubt as to defendant's sanity.' " (*People v. Carlson* (1980), 79 Ill. 2d 564, 580, quoting *People v. Ward* (1975), 61 Ill. 2d 559, 568.) On this record the jury was not required to draw the inference that defendant was insane, and the evidence amply supports the verdict.

Defendant contends next that the circuit court erred in its ruling "that expert witnesses for the State would be allowed to recount statements made to them by John Gacy, but that defense expert witnesses could not do so *** ."

In determining that an expert psychiatrist or psychologist may be precluded from repeating a defendant's self-serving statements, the circuit court relied primarily on *People v. Hester* (1968), 39 Ill. 2d 489. In *Hester*, a defense psychiatrist was precluded from giving his opinion "of the defendant's susceptibility to a dictated confession which would have been based on a complete case history given by [defendant] to the psychiatrist during their second interview." (39 Ill. 2d 489, 509.) The court, noting the rule that only treating physicians could testify "as to [their] medical opinions based upon subjective symptoms described by the patient," held that it was not an abuse of discretion for the trial court to so limit the psychiatric testimony. Noting that "doubt is cast upon the trustworthiness of the patient's statements" when those statements are made to an examining expert in contemplation of trial, and that "most courts refuse to

permit the physician to act as the patient's conduit for narrative declarations," the court found no reversible error. In *People v. Noble* (1969), 42 Ill. 2d 425, 432-35, the court held that psychologists could testify as to the psychological tests they administered, such as the Bender visual motor test, the Rorschach test, and the Thematic Apperception test, and could testify as to the results of those tests. The court reasoned, *inter alia*, that since psychiatrists used psychologists as one of their "tools" for diagnosing a patient, it would be an anomaly to refuse to allow the psychologist to explain the nature of the tests administered by him and the results of those tests. 42 Ill. 2d 425, 435-36.

There are authorities which hold that the statements made by the accused to the examining psychiatrist should be admitted. (See 2 Wharton, Criminal Evidence sec. 312 (13th ed. 1972); *United States v. Baird* (2d Cir. 1969), 414 F.2d 700.) The rationale as stated in *State v. Whitlow* (1965), 45 N.J. 3, 15-19, 210 A.2d 763, 769-71, is:

> "It is obvious, even to the layman, that in all probability a psychiatrist would require more than a mere physical examination of a defendant in order to reach a conclusion of his sanity or insanity. The very nature of the psychiatric study would seem to call for utterances or answers through conversation with the alleged incompetent. The psychiatric interview is the basic diagnostic tool. \* \* \*
>
> \* \* \*
>
> There seems to be a tendency elsewhere in insanity cases to allow the defense psychiatrist to recount the full history obtained from the defendant regardless of its hearsay or self-serving quality, so long as the doctor regards it as essential to the formulation of his expert opinion. If he so regards the history, the test of admissibility is satisfied. The thesis is that such conversations with and statements by the defendant, whether or not they relate to the crime itself, are verbal acts; circumstantial ev-

idence for or against the claim of insanity. They do not come in as evidence of the truth of the facts asserted but rather, and only, as part of the means employed by the doctor in testing the accused's rationality, mental organization and coherence. They are object-like factors used to ascertain mental abnormality or the reverse."

We need not, however, decide the question here for the reason that our review of the record shows that defendant's experts were not precluded by the circuit court's ruling from stating, or explaining to the jury, the basis for their conclusions. As the circuit court noted, "as a practical matter, your statements [defendant's statements to defendant's experts] are actually going in anyway ***."

The circuit court's first application of its ruling that defendant's experts could not testify to "self-serving" statements made by defendant occurred during the testimony of Dr. Eliseo. Dr. Eliseo had been asked by defense counsel to examine defendant and make a diagnosis without reviewing any of the information thus far gathered in the case, ostensibly for the reason that they did not wish him to be "prejudiced" by this information. Dr. Eliseo was, however, permitted to give his opinion based on a hypothetical question propounded by defense counsel, and thus expressed his opinion to the jury. In any event, Dr. Eliseo was permitted to explain in narrative form "exactly how [he] came to the decision or opinion that the condition of paranoid schizophrenia existed for the last 6, 8 years."

Dr. Freedman, whose qualifications spanned over 30 pages of transcript, reviewed defendant's statements in explaining his diagnosis to the jury. After stating his diagnosis, Dr. Freedman explained how he reached his conclusions. He was allowed to testify, without objection, that defendant described to him the conditions under which Robert Piest was killed and that while describing

this murder in great detail he showed no "ordinary manifestations of human feeling," that defendant exhibited a "certain amount of pride" in being able to use his cunning to overcome the strength of the "young and stupid" "muscular youths," and that defendant was very disturbed by the fact that Dr. Freedman's books were piled up in his office in a disorderly fashion. While Dr. Freedman was not permitted to testify as to defendant's exact statements without quoting defendant directly, he explained the contents of those statements. He testified concerning defendant's anxiety regarding his sexual identification and his anger at being called a homosexual, and that defendant showed no emotional affect when he described the stabbing of his first victim.

Dr. Traisman described defendant's response to the various tests he administered. Dr. Rappaport testified that he administered sodium amytal to defendant to induce a deep hypnotic condition. While Dr. Rappaport was precluded from testifying concerning defendant's description, while under the influence of this drug, of his early life he testified that defendant had not told him any "new memories" that he had not told "in his waking state," but that he had described events in greater detail. Although Dr. Rappaport was precluded from testifying concerning statements made by defendant about his life history or why he behaved in a particular manner, he explained, in a narrative form, defendant's developmental history as compiled in police reports and interviews with defendant's relatives and childhood friends and how events have influenced his development. Dr. Rappaport testified concerning speech patterns which demonstrate "loose associations" or inappropriate affect, and despite objections by the prosecution, in many instances Dr. Rappaport repeated defendant's statements to him.

Defendant asserts that defense counsel were required to bring out defendant's statements in cross-examination

of the People's experts because they "had to keep in mind that the judge had repeatedly ruled that the State experts could refer to statements made by the defendant to justify their conclusions." Appellate counsel concedes, apparently, that defense attorneys were permitted to bring out "during cross-examination those statements made by Gacy to the State experts which tend to contradict or rebut their conclusions." Defendant concludes, however, that the State experts were allowed to explain their conclusions, but the defense experts could not. Defendant asserts that there is no way of determining the stifling effect the judge's ruling had on the defense experts.

The record does not support defendant's assertions. The record is replete with examples of defendant's experts explaining the bases of their determinations although not quoting verbatim his statements. Moreover, defense experts were able to explain how the events of defendant's childhood and adolescence, as corroborated by numerous friends and relatives of defendant, affected defendant's development. Because no offers of proof were made concerning the testimony which would have been elicited from defendant's experts, it is impossible to determine the adverse effect, if any, of the alleged error.

Defendant next asserts that he was denied his fifth amendment right against self-incrimination when his statements to the People's experts were disclosed to the jury. Defendant argues that the jury was not instructed that it could consider these statements only as to defendant's mental state and that, even if such an instruction were given, it would "inevitably be ineffectual, and that the defendant's rights can therefore only be protected by a blanket rule prohibiting experts from recounting the defendant's statement." We consider this contention to be without merit. We note that it was defendant who sought to introduce these statements into evidence. Fur-

thermore, since there was no question at trial other than defendant's sanity, no prejudice could have occurred. Defendant, in his reply brief, asserts that he never abandoned his claim of innocence because "at jury selection and at the time of jury instructions the jury was informed that there were two issues to be resolved: guilt and sanity." This contention is difficult to accept in light of defense counsel's statement in opening argument that the insanity defense "is the only defense that we could use here," the defense experts' admission that defendant had committed the acts, and the lack of any evidence in the record which would tend to dispute the charge that defendant had committed the murders.

Defendant also argues that failure to instruct the jury that defendant's statements to the People's experts could be used only with regard to the issue of sanity deprived him of a fair sentencing hearing, because many of the statements could be used as factors in aggravation. This issue was waived. Not only did defendant fail to object to the use of these statements, he stipulated to their use and, at least in part, relied on them in arguing that his mental defect constituted a factor in mitigation which should preclude the death penalty. To review this issue would permit defendant to inject error into his own case. Appellate counsel's suggestion that trial counsel's failure to pose an objection is indicative to incompetence of trial counsel is also without merit. Not only was the emphasis of this mitigating factor an acceptable choice of trial strategy, it appears to have been the only strategy available to trial counsel.

Defendant next argues that his fourteenth amendment right to due process was violated because Dr. Cavanaugh testified that if defendant were acquitted it would be impossible to guarantee that he could be confined to a hospital for the rest of his life. At *voir dire*, defense counsel requested that prospective jurors be in-

structed concerning civil commitment. As previously noted, defense counsel, in opening argument, twice suggested that defendant should be committed to a hospital for the rest of his life. During direct examination of Dr. Cavanaugh, the assistant State's Attorney asked, without objection, whether it was possible to guarantee confinement in a mental hospital for the rest of a patient's life. Dr. Cavanaugh stated that it was impossible to guarantee confinement in a mental institution because the legal standards for confinement to an insane asylum were constantly changing. Defense counsel objected, a side bar was had, and the court told defense counsel that the objection was not timely. The court stated that it thought that defense counsel wanted to "try [the answer] out for a while" and interposed an objection only when it became obvious that the answer was unfavorable to defendant's case. The circuit court ruled that nothing further should be said on the matter. Despite this, defense counsel asked Dr. Cavanaugh whether defendant, if he were acquitted, could be civilly committed. Dr. Cavanaugh testified that he could not if the law were followed. The court stated that neither side could raise an irrelevant issue and instructed the jury to disregard the colloquy because it was irrelevant to the issues of the case. The question raised could serve only to divert the jury's attention from the issues in the case (*People v. Yates* (1983), 98 Ill. 2d 502, 539), and the court correctly instructed the jury to disregard the testimony and the comments. On this record the instruction was sufficient to render harmless any effect which the testimony may have caused, and we find no error which warrants reversal.

Defendant contends next that the circuit court erred in permitting certain experts to testify that they had found defendant fit to stand trial. Several of the experts were permitted to testify that they had found defendant

fit to stand trial, and in each instance the witness also explained the difference between fitness to stand trial and the insanity defense. The People argue that an expert's finding that the defendant was fit to stand trial was relevant to the question of defendant's sanity at the time of the crime. While there may be instances where such evidence is relevant, we fail to see its relevance here. We hold, however, that the introduction of this evidence did not constitute reversible error. The defense theory was that defendant was able to function well in society except when stress levels rose so high that he experienced something akin to a psychotic episode and that defendant was fit to stand trial was consistent with his defense. Since the difference between fitness for trial and sanity was clearly and repeatedly explained to the jury, we do not believe that the jury was confused by the introduction of this testimony and the error was harmless.

Defendant next complains of three instances where counsel was allegedly improperly restricted in his examination of several experts. First, defense counsel asked Dr. Rappaport a series of questions concerning how "substance use disorders" fit into Dr. Rappaport's diagnosis. Objections were sustained to any questions concerning substance use or substance abuse, apparently for the reason that there was no evidence of this in the record. We find, however, that the error, if any, was harmless for the reason that objections to the questions were sustained after Dr. Rappaport had answered them. Furthermore, Dr. Freedman testified concerning large intakes of valium, alcohol and marijuana which accompanied the episodes where the "most acute and dangerous paranoia" emerges. The jury was informed that Dr. Cavanaugh's and Dr. Fawcett's reports referred to alcohol and drug abuse. Second, defendant asserts that the circuit court erred when it refused to permit defense

counsel to question Dr. Hartman concerning whether he had diagnosed anyone as "borderline" in the previous 28 years. We agree with the People that this question was improper. The testimony shows that "borderline personality disorder" was given that designation for the first time in DSM III (Diagnostic Statistical Manual III), which was approved and adopted by the American Psychiatric Association while this case was being tried. While defendant asserts in his reply brief that "borderline personality" is only a new label for a diagnosis which has existed for a long time, and Dr. Hartman could have explained this, we are of the opinion that the objection to the form of the question was properly sustained. The question specifically asked if Dr. Hartman had diagnosed anyone in the last 28 years as "borderline." If defense counsel wished to inquire whether Dr. Hartman had ever diagnosed a patient using one of the previous labels for this condition, he could have done so. Third, defendant complains because he was not allowed to ask Dr. Hartman:

> "In a borderline, a person suffering from borderline personality organization manifests many, many characteristics of the sociopath, isn't that right?"

We agree with the People that his question was vague and ambiguous. Defense counsel could have questioned the expert as to particular symptoms and then asked if that was consistent with the diagnosis of "borderline." It was not improper for the circuit court to preclude the asking of the question which might require a variety of answers depending on how it was interpreted. We conclude that these three alleged errors, in a transcript containing more than 5,500 pages, could not have deprived defendant of a fair trial.

Defendant next argues that it was improper for Dr. Garron, called by the People, to state an opinion concerning whether defendant suffered any nonorganic

brain disorders when he had been asked as a neuropsychologist to examine defendant for the purpose of determining whether there were any organic brain disorders. Defendant argues that an expert may not state an opinion when there is no factual basis to support his finding, and since Dr. Garron specifically testified that he was not asked to examine defendant for nonorganic brain disorders, no factual basis existed. The People argue that there was a factual basis for his opinion since Dr. Garron administered a Rorschach test, that Dr. Garron had used this test to evaluate defendant's "mood, emotional state, and emotional organization," and that in any event Dr. Garron's testimony was admissible to rebut Dr. Traisman's statement that any experienced clinical psychologist would interpret the results of a Rorschach test in the same manner. We need not address all these assertions, as we find that Dr. Garron had a sufficient factual basis for his opinion. The Rorschach test was used by almost every expert testifying in this trial, and each expert testified that it was useful to some degree in formulating a diagnosis. The fact that this was the only test given which related to nonorganic brain damage and that Dr. Garron did not examine defendant for the purpose of diagnosing nonorganic brain disorders affects the weight, not the admissibility, of his testimony.

Defendant next argues that the People improperly impeached Dr. Freedman. Dr. Freedman did not state an opinion whether defendant was legally insane at the time of the crimes because he believed that such a determination was outside the field of his expertise. On cross-examination, Dr. Freedman stated that he had given such an opinion in the Simon Peter Nelson case. On redirect examination, Dr. Freedman stated that he gave an opinion in that case because he was with Mr. Nelson and saw "a total reenactment under my eyes of a dissociated state by psychotic episode in which this man killed his

beloved six children ***." Defense counsel asked if he actually witnessed this, and Dr. Freedman replied: "I have, the tape which I have played to many experts, and no one doubts ***." On re-cross-examination, the following colloquy occurred:

"Q. The jury doubted you, didn't they?
A. I don't think so.
Q. They found him guilty, didn't they?
MR. AMIRANTE: Objection.
THE WITNESS: And they advised the judge against capital punishment because of his emotional state."

The objection was sustained and the court instructed the jury:

"Ladies and gentlemen, what happened in another case certainly won't help us decide this case, so any reference to results of another case is improper consideration."

The People argue that this was proper impeachment because the jury could have inferred that what "no one doubted" was that Dr. Freedman was correct in his opinion concerning whether Simon Peter Nelson was legally sane or not, and not whether he was with Nelson when he had a recurrence of his psychotic episode. We find it unnecessary to address this question, because even if this alleged impeachment were improper, it was not damaging to defendant's case. From the fact that the jury in that case had found Nelson guilty but advised against capital punishment because of defendant's emotional state, the jury in this case would no doubt infer that the jury in that case believed that Dr. Freedman's observation of the psychotic episode was indeed correct. Additionally, a cautionary instruction was immediately given and the jury was instructed to disregard the entire line of questions.

Defendant also complains that the People improperly bolstered Dr. Cavanaugh's testimony. During the People's case in rebuttal, the following colloquy occurred:

"MR. KUNKLE: Q. Now, with respect to the [Isaac Ray Center] statistics, did you in fact keep statistics and publish them in your first annual report at that time, 35 evaluations having been completed through the court system?

You keep statistics as to any corrolation with your decision as to what the ultimate factfinders find?

A. Yes. In that first annual report, the coefficient corrolation which really means the degree of agreement between our opinion and the factfinder, the judge or jury's opinion was .8, which basically means eight out of ten times our finding—

MR. MOTTA: Objection to this, Judge.

THE COURT: Objection sustained."

Defendant concedes that an objection was sustained, but that the damage to the defendant is so great that the error cannot be considered harmless. The People respond that in this case the evidence was relevant since "the validity and reliability of various schools of psychiatric diagnosis were attacked by both sides" and that "any information on the reliability of Dr. Cavanaugh's technique was a proper matter for the jury's consideration." We agree with the circuit court that what other juries decide in other cases is not relevant and that the percentage of diagnoses accepted by the finder of fact is not necessarily indicative of the reliability of that expert's techniques. It was within the province of the trial court to determine that whatever probative value this information had was outweighed by the danger of the defendant's being convicted by statistics rather than by the evidence in the case. In view of the sustained objection, we hold that defendant was not prejudiced.

Defendant next argues that the People's cross-examination of Dr. Rappaport was improper. At the beginning of the cross-examination of Dr. Rappaport, the following colloquy occurred:

"Q. Let me ask you this: did you or anyone from your

office call more than one television station last night—

MR. MOTTA: Objection, Judge.

MR. KUNKLE: Q. —indicating your willingness to be interviewed in the midst of your testimony?

A. No.

Q. You didn't?

A. No.

Q. You didn't walk out here in the hall with the press people and indicate that you were available for interviews?

MR. AMIRANTE: Objection: Judge, he was—

THE WITNESS: A. No.

MR. AMIRANTE: —with me when he walked out, we didn't talk to the press."

The circuit court immediately instructed the jury that it was not to imply that this in fact occurred. Later, at a side bar, the court asked Dr. Rappaport if he had attempted to contact the news media in any way. Dr. Rappaport explained that he had not contacted the news media nor did he know of anyone who had. Defense counsel insisted that the jury could draw an inference from the prosecutor's question that Dr. Rappaport had violated the court's order forbidding attorneys, experts and other parties from talking to the press about the case. The assistant State's Attorney stated that he had the name of an "interviewer" who was told by Dr. Rappaport that he was available for an interview, but would not disclose the name unless instructed by the court to do so. Acknowledging that the People would have to call these newsmen on rebuttal, and that there might be some problem with "the newsmen privilege," the court ruled: "I feel that it is on such an insignificant point that it would not be worth the legal ramifications of attempting to put in that rebuttal, so I would instruct the State not to put in that rebuttal, and I will instruct the jury to disregard anything regarding that." The court then instructed the jury to disregard any remarks concerning

this matter.

Citing *People v. Steptore* (1972), 51 Ill. 2d 208, 216, and *People v. Pfanschmidt* (1914), 262 Ill. 411, defendant argues that a witness may not be impeached on a collateral matter and that "the test of collateralness is whether the fact for which the testimony is offered in contradiction of a witness' testimony could have been shown in evidence for any purpose independent of the alleged contradiction." Citing *People v. Pumphrey* (1977), 51 Ill. App. 3d 94, defendant argues if the sole purpose of the impeaching evidence is to contradict the witness and if it is not relevant for any other purpose, it is inadmissible.

We note that it was defense counsel who injected the issue of bias of the expert witnesses into this trial with the remarks in opening argument that the People's experts were "mechanics for the State" or had "inflexible biases." The People's response to this bias argument, at least as far as Dr. Rappaport is concerned, appears to be that, as a private practitioner, Dr. Rappaport would rely heavily on defense attorneys and criminal defendants for business. The witness' use of this trial for publicity would be relevant to the inference that he had a motive to testify for the defense. The People had the right to cross-examine the witness concerning his bias, prejudice or interest in the outcome of the suit (*People v. Sampson* (1953), 1 Ill. 2d 399, 404), but we agree with the circuit court that the matter was insignificant and, in view of the instruction to the jury to disregard it, was not prejudicial.

Defendant contends next that the People improperly insinuated that defense counsel and defendant had concocted the insanity defense the night before defendant's arrest. On direct examination of Detective Michael Albrecht, the following colloquy occurred:

"MR. KUNKLE: He said he had four Johns and he doesn't know all of the personalities.

Q. Now, this was after he had been to his lawyers' the night before, is that right?

A. That is correct."

Defense counsel immediately objected and asked for a side bar. Mr. Amirante stated: "That's a direct attack on defense counsel's integrity. It calls for a mistrial, I'm making a motion for mistrial." The court stated: "I myself didn't interpret it that way. Number 1, he goes to his lawyer, it doesn't necessarily follow that the lawyer is suggesting he's going to a lawyer and he's coming up with this." Defense counsel insisted that the insinuation was "obvious," and the court reiterated that it did not necessarily interpret the question in that manner and that "it better not be argued that way" and that the assistant State's Attorney "better tell whoever is going to argue not to argue that." We cannot agree with defendant that the People's questions admit to only one inference. The People did not argue that Mr. Amirante concocted the multiple-personality defect and told defendant to use it. The People were entitled to argue, however, that defendant's visiting his attorneys the day before he was arrested and telling the police that there were "four Johns" tended to establish that defendant had concocted the multiple-personality defect and was attempting to use it to avoid responsibility for his crimes.

Defendant cites *United States ex rel. Macon v. Yeager* (3d Cir. 1973), 476 F.2d 613, 615-16, and other cases, and argues that the People's reference to defendant's exercise of his right to counsel is a violation of the sixth amendment. In *Yeager*, the defendant, after a shooting incident, drove away from the scene with his friends and instructed his friends "to give no statements and to take no action until he had consulted his attorney." (476 F.2d 613, 614.) The next morning he telephoned his lawyer

and was later arrested. During closing argument, the prosecutor argued:

> "He goes home and puts the shirt down in the chest, a torn shirt. Then he goes to bed. He says he had trouble sleeping. He gets up the next morning and lo and behold, what does he do? He calls his lawyer. *These are acts of innocence?* (Emphasis added.)" (476 F.2d 613, 614.)

We find *Yeager* distinguishable. In *Yeager*, the prosecutor argued to the jury that they could infer defendant was guilty because he consulted his attorney after the alleged criminal act had occurred. Here, however, the inference which the assistant State's Attorney was asking the jury to draw was that defendant's consultation with his attorneys prior to making statements to police concerning multiple personalities supported the experts' conclusions that defendant was attempting to fake an insanity defense. That he confessed to 30 murders also supports the inference that he was aware that his conduct was criminal. We note, also, that the evidence that defendant had confessed to. 30 murders to his attorneys came from Cram's statement that defendant told him that he had told his attorneys that he had killed 30 people.

Defendant next argues that the introduction of certain improper evidence and argument based on that evidence denied him a fair trial. Defendant argues that the following information was irrelevant and prejudicial: that Robert Piest was of good character; that Darryl Samson, Russell Nelson and William Kindred had planned to marry; that Robert Gilroy and John Mowery had planned on furthering their education; that Piest had been on the honor roll, the gymnastics team, and was "two badges away from making Eagle Scout, a badge which Robert had wanted badly"; that Nelson had graduated with honors and won a scholarship to the University of Minnesota and that Nelson and his future wife had the names of their children already chosen. Defendant also com-

plains that Mary Jo Melanie Paulus had testified with a brace on her neck despite defendant's offer to stipulate to her testimony.

The People respond that all this information was relevant to defendant's assertion that his victims were "street hustlers," "homosexuals" and "human trash." The People note that defense counsel, during opening argument, asserted that all the victims shared "certain sexual preferences." The People also note that defendant, in his confessions to the police, asserted "that all of the victims had been homosexual, bisexual, and that all had come to Gacy's house expecting to be paid for sex," that "all of the victims were hustlers, mostly from Bughouse Square," that "he never bothered straight people," that "the victims had killed themselves because they had sold their bodies for $20," and that "his victims were all male prostitutes." The People assert that the defense experts repeatedly suggested that defendant "regarded the boy prostitutes he picked up as trash," and that defendant "thought that he was performing a service to society by disposing of human trash, namely homosexual prostitutes."

We agree with the People that evidence concerning the victims' sexual preferences was relevant to negate the assertion that all the victims were homosexual prostitutes. Moreover, the evidence concerning Piest's activities in school and outside of school was relevant to defendant's statement to Officer Bettiker that Piest stated he would do almost anything for a great deal of money and the suggestion of a possible exchange of money for sex acts involved in the Piest murder. We fail to see the relevance, however, of evidence that Russell and his future wife had the names of their children already picked out and that Mrs. Nelson would not divulge the name of Russell's girl friend because she was trying to make a life of her own and was very upset about

what had happened. Additionally, we also fail to see the relevance in the evidence of the victims' surviving siblings or that Piest wanted to make Eagle Scout "badly" and similar information. Moreover, we agree with defendant that the prejudicial nature of this information was compounded by reference to it in closing argument. For example, the prosecution stated: "Thirty-three boys were dead and the lives of parents, brothers and sisters, fiancees, grandmothers, friends were left shattered." This court has found reference to the ages of the decedents' children to be highly inflammatory, requiring reversal even in the absence of an objection because the "highly prejudicial nature of such evidence is so well established *** that it was the duty of the court in a murder case to have refused it on its own motion." (*People v. Bernette* (1964), 30 Ill. 2d 359, 372.) However, we conclude that reversal is not required under the facts of this case. It has been recognized that the effect of prejudicial or inflammatory evidence depends upon the circumstances of the case. In *People v. Jones* (1982), 94 Ill. 2d 275, the jury was informed that the defendant had been involved in numerous murders and had assaulted a couple living in East St. Louis, slashed the woman's throat, bludgeoned her face and head, cut deep gashes in her hands and arms, decapitated her husband, and carried the head of the husband and later discarded it. Rejecting an argument that certain photographs were prejudicial and inflammatory, this court stated:

> "It is unlikely that at this point in the proceedings the photographs would have created more revulsion in the jurors toward defendant than was already present. Since the jury deliberations took approximately 20 minutes it is clear that there was little difficulty in deciding that the death penalty was warranted, and we do not believe that the admission of these photographs at this late date in the proceedings deprived defendant of the right to be

sentenced by a rational tribunal." (*People v. Jones* (1982), 94 Ill. 2d 275, 293-94.)

In this case, the evidence which might create revulsion in the jurors toward defendant included the sadistic torture of Rignall and Donnelly, his record-breaking number of murders, his homosexual assault on some of the victims before their murders, and other facts too numerous to mention. Considering that after a lengthy trial the jury required approximately 1 hour and 45 minutes to reject defendant's insanity defense, we conclude that defendant was not deprived of the right to be convicted by a "rational tribunal."

Defendant next contends that there were many instances where the People engaged in improper closing argument. Defendant argues that the assistant State's Attorney misstated the test for insanity when he stated: "But because he is abnormal doesn't mean that he doesn't know the difference between right and wrong. If he does, he is legally responsible." The assistant State's Attorney repeatedly stated the proper test, and the jury was not misled by this one statement. Second, defendant argues that the assistant State's Attorney improperly discredited Dr. Freedman's testimony by exaggerating the significance of DSM III and intentionally misrepresenting "the doctor's testimony regarding his diagnosis in relation to the manual." In closing argument, the assistant State's Attorney argued:

> "He [Dr. Freedman] used terms that are nonexistent in DSM III. Now I'm not going to talk to you in detail about the diagnoses that are in DSM III. I know you have heard more of that than you want to hear anyway. But if psychiatrists themselves cannot agree on what the terms are, on what the language means, then how can they communicate with each other, and, more important, how can they possibly communicate with us?"

Defendant asserts that the assistant State's Attorney's

attack on Dr. Freedman was not justified by the evidence. Defendant argues that equivalent diagnoses were contained in earlier drafts of DSM I and DSM II. Defendant's argument, however, concerns the persuasiveness of the assistant State's Attorney's argument, not its impropriety. We find no error. Third, defendant argues that the assistant State's Attorney improperly distorted the testimony of Dr. Rappaport and Dr. Eliseo. We have reviewed defendant's contentions, and are of the opinion that the assistant State's Attorney did not transcend the bounds of proper argument by characterizing Dr. Rappaport's testimony as he did or in drawing the inferences he believed were proper from that testimony. Defense counsel was free to argue that the evidence did not support the assistant State's Attorney's conclusions but rather supported the conclusion suggested by him. We find no error. Fourth, defendant argues that the assistant State's Attorney improperly implied that the success of defendant's expert witnesses' private practices depended upon finding defendants insane where there was no evidence to support this implication. The assistant State's Attorney argued:

"Well, let me ask you something, consider something about privately retained psychiatrists who practice in the legal field. If a psychiatrist's only business comes from defense lawyers, if that is where his referrals come from, how many referrals do you think he is going to get back from that lawyer, or that lawyer's firm if he keeps finding people sane at the time of the crime?"

Defendant did not object to this argument and any alleged error is waived. Defendant contends that it was improper for the assistant State's Attorney to impugn the integrity of Dr. Morrison by commenting that she had the "nerve" to submit a bill for $9,000. No objection was made to this argument, and the issue is therefore waived. Defendant argues that the assistant State's At-

torney improperly stated that Dr. Heston had not been compensated for examining the defendant. Defendant argues that because at the time he examined defendant, Dr. Heston was employed by the University of Iowa Medical School, he was receiving compensation since he examined defendant "as part of his job." No objection was made to this argument, so it too is waived. Defendant argues that the assistant State's Attorney's statement "that the psychiatric institute testified on behalf of defendants 75% of the time" was not based on facts in evidence. The assistant State's Attorney stated:

"I don't know what the detailed statistics of the psychiatric institute are. But if they aren't 75 to 25 for the defendants, it would certainly surprise me."

No objection was made to this, so the issue was waived on appeal. Moreover, since Dr. Reifman testified that he testified on behalf of defendants about 60% of the time, even if the estimate is inaccurate, it was not totally unwarranted.

Defendant argues that it was error for the circuit court to refuse this instruction:

"You are instructed that you are not bound by medical labels, definitions, or conclusions as to what is or is not a mental disease."

The court in refusing the instruction, explained:

"I have indicated that I would not give that unless the defense—unless the State argued that in order to be a mental disease, it would have to be in the DSM III which they have not argued."

Defendant argues that the State did in fact argue this when it argued that Dr. Freedman used terms that were not in DSM III. The People respond that the instruction was unnecessary as every medical expert who testified placed a "medical label" on defendant's condition, that there was little agreement as to which medical label was appropriate, and no one contended that in order to be

valid, it was required that the medical label be listed in DSM III. The People argue further, citing *People v. Williams* (1967), 38 Ill. 2d 115, and *People v. Miller* (1965), 33 Ill. 2d 439, that the instruction was properly refused because it did not contain a correct statement of law, as Illinois does not recognize a "mere personality disorder" as meeting the test for insanity. The People argue that the proposed instruction was improper in that it "singled out a particular item of expert testimony" contrary to *People v. Speck* (1968), 41 Ill. 2d 177, 196-97, and was correctly refused because it was argumentative.

We are of the opinion that the instruction was properly refused. Contrary to defendant's assertion, the People did not argue that in order to be a mental disease, the disease must be listed in DSM III. The People argued that if Dr. Freedman did not use a term which is listed in the current diagnostic and statistical manual, and if the psychiatrists could not agree on which terms to use and what those terms mean, then it would be difficult or impossible for them to communicate with each other and, more importantly, with the jury. The jury was properly instructed concerning the credibility of witnesses (Illinois Pattern Jury Instruction (IPI), Criminal, No. 1.02 (1968)) and on the insanity defense (IPI Criminal No. 24.01), and defendant's instruction was unnecessary.

Defendant next argues that he was denied effective assistance of counsel because trial counsel indicated to the jury that evidence would be forthcoming which was never presented; because defense counsel repeatedly failed to object to misconduct by the prosecutors, and because they failed to tender a needed instruction. As indicated above, at opening argument defense counsel stated that four psychiatrists would testify for the defense. Defense counsel stated: "We have four psychiatrists who will testify in court ***," and then listed them. Several

pages later in the transcript, defense counsel stated, in the middle of a paragraph explaining the relation between the defendant's alleged mental disease and the question of whether he lacked substantial capacity to conform his conduct to the requirements of the law:

"And again, those psychiatrists will testify that he was unable to fully and consciously control his acts, which are motivated by overwhelming and uncontrollable primitive drives."

From these statements, defendant concludes that the jury was expecting to hear four psychiatrists render an opinion that defendant was insane and that "the jury could not help but be skeptical of the defense" when they discovered that two psychiatrists would not state an opinion whether, under Illinois law, defendant was legally insane. The People argue that the comment neither stated nor implied that all the defense psychiatrists would render an opinion as to whether defendant would meet the statutory requirements for legal insanity and that, in any event, it is unlikely that the jury would have even remembered this comment in opening statement after hearing a month of complex and conflicting psychiatric testimony. We agree with the People on both contentions and reject defendant's argument.

Defendant's other citations to trial counsel's alleged incompetence are without merit. Defendant argues that trial counsel failed to tender an instruction to the effect that the jurors could only consider defendant's statements made to the examining expert witnesses with reference to his mental condition. As we have already noted, since there never was a question concerning whether defendant actually committed the 33 murders, the instruction was unnecessary, and thus there was no reason for defense counsel to tender such an instruction. There is no merit to the contention that the prosecutor misstated the legal test for insanity in closing argument;

thus there was no reason to interpose an objection, and trial counsel's failure to object to certain evidence concerning the victims does not constitute incompetence. Rather, this voluminous record is replete with indications that trial counsel expended considerable effort in seeking out expert witnesses for defendant and preparing for the cross-examination of the People's experts. Trial counsel presented numerous pretrial motions and vigorously objected to perceived errors throughout the trial. Defense counsel obviously made extensive efforts to research defendant's family history and early adult life. There is no merit to the assertion that their representation was ineffective.

Defendant argues that the murder of Timothy O'Rourke was not proved beyond a reasonable doubt and that this erroneous conviction necessitates a remand for a new sentencing hearing. Defendant's assertion that this murder was not proved beyond a reasonable doubt rests upon a distortion of the record. The doctor performing the autopsy listed the cause of death as "apparent drowning." The body was too badly decomposed to determine the cause of death with reasonable certainty, and the doctor performing the autopsy stated that he was unable to determine whether O'Rourke was dead when placed in the water. No gross amount of water was found in his lungs, which suggests that he might not have drowned. Although defendant asserts that there "were no signs of any trauma," the doctor performing the autopsy testified that strangulation could not be ruled out as a possible cause of death. Defendant's assertion that there was no evidence to connect Timothy O'Rourke with him is contrary to the record. O'Rourke was an admitted homosexual living with a transsexual lover on the north side of Chicago. The transsexual lover testified that O'Rourke had gone out to get cigarettes one night and never returned. Defendant had confessed

that he had picked up one of the young men whose body was found in the river at Clark and Lawrence in Chicago, one block from where O'Rourke and his transsexual lover were living. When O'Rourke's body was found in the Des Plaines River in Grundy County, it was naked and bloated. This physical evidence indicated that the body had been in the river a long time and that the victim may have been involved in a sexual murder. In view of the fact that defendant stated he threw five bodies from the I-55 bridge and all five bodies were found in the same general vicinity, a reasonable inference to be drawn was that O'Rourke was one of defendant's victims. We are of the opinion that the testimony concerning O'Rourke's disappearance, when considered with defendant's statement as to where he picked up one of his victims, the location of the body in the Des Plaines River, the physical condition of the body when found, and defendant's statement that he threw five bodies in the river, in light of all the evidence in this case, was sufficient to permit the jury to conclude that defendant had murdered Timothy O'Rourke and the People had proved this beyond a reasonable doubt.

Defendant next asserts that he was not proved guilty beyond a reasonable doubt of committing indecent liberties and deviate sexual assault on Robert Piest as there was no *corpus delicti* for these offenses. Defendant also asserts that he cannot simultaneously be convicted of deviate sexual assault and indecent liberties on Robert Piest. The People respond that since no sentence was imposed on either charge the issue is moot. The People also assert that defendant's confession to deviate sexual assault and indecent liberties on Piest was sufficiently corroborated. Citing *People v. Willingham* (1982), 89 Ill. 2d 352, 360, the People argue that they need not prove the *corpus delicti* beyond a reasonable doubt, but only introduce some evidence to corroborate the defendant's

confession that a crime occurred. The People argue that the following evidence sufficiently proves a *corpus delicti*: Piest's body was recovered naked except for a pair of socks, the handcuffs used on Piest were recovered, there was no conceivable motive for killing Piest unless defendant was trying to cover up a deviate sexual assault, and the pattern of killing by defendant supports a contention that a deviate sexual assault occurred.

We find it unnecessary to address these contentions. Since no sentences were imposed on these convictions, the remaining question is whether the convictions, if improper, would have affected the sentencing jury. As the People point out, with or without the convictions, the jury still would have been exposed to defendant's confession which detailed the assault on Piest. Moreover, considering the enormous amount of evidence establishing aggravating factors against defendant, we cannot say that these convictions, even if improper, deprived defendant of a fair sentencing hearing.

Defendant next argues that his representation at the death penalty hearing was incompetent. Defendant cites four factors that allegedly demonstrate the low level of his representation. The factors are: failure to prepare for the hearing, failure to present any evidence on the statutory mitigating factor of extreme mental or emotional disturbance, failure to present other mitigating evidence, and failure to make a competent closing argument.

Defendant contends that his trial counsel should have requested a continuance to prepare for the sentencing hearing. From what appears to be counsel's plan, however, no lengthy preparation was necessary. Trial counsel stipulated to the admission at the sentencing hearing of all the evidence presented at trial. Since counsel's plan seems to have been to limit his presentation at the sentencing hearing to a plea for mercy, counsel may have decided that any continuance in a trial which has already

lasted more than one month, with a jury in sequestration, would serve only to antagonize the jury toward the party requesting the continuance. Thus, assuming that trial counsel's strategy for the sentencing hearing was reasonable, there was no need for him to request a continuance before the hearing.

Defendant next complains that his trial counsel was incompetent for failing to present any evidence on the statutory mitigating factor of extreme mental or emotional disturbance. Defendant argues that any of the expert witnesses who testified for either side should have been examined at the sentencing hearing on this point. Trial counsel, however, chose not to recall any of the expert witnesses, but by using their previous testimony, which had been admitted by stipulation in the sentencing hearing, argued to the jury that the previous expert testimony was sufficient to show this mitigating factor. We cannot say that it was incompetent for trial counsel to make this choice and to possibly avoid antagonizing the jurors by subjecting them to psychiatric testimony which may have sounded repetitive to them. Alleged incompetency arising from a matter of trial tactics or strategy will not support a claim of ineffective representation. *People v. Haywood* (1980), 82 Ill. 2d 540, 543-44.

Defendant next contends that his trial counsel was incompetent since he failed to present other mitigating evidence. Defendant contends that such evidence could have included his childhood experiences, his family relationships, his business career, and his charitable and civic work. As in the prior argument where defendant contends that psychiatric testimony could have been repeated at the sentencing hearing, trial counsel may also have made the tactical choice not to repeat the suggested mitigating evidence of such matters as his family relationships and civic work which were already presented at trial. As before, we will not question what ap-

pears to be, on these facts, a tactical decision.

Defendant also complains that his trial counsel made an incompetent closing argument. We cannot agree. Counsel, pointing to the psychiatric testimony introduced at trial, first argued that defendant acted under an emotional disturbance. Next, in the main theme of counsel's closing argument, he proposed that it would be better to study defendant than to have him executed in an act of revenge. We must judge the remarks in their setting and against the background of the jury's verdicts. Trial counsel could have made the decision that it would be better to argue against the death penalty itself than to try to explain that there were mitigating factors sufficient to avoid the death penalty in light of the 12 murders of which defendant had been convicted and for which defendant was eligible for the death penalty. The same jury had also convicted defendant of 21 other murders and of indecent liberties with a child and deviate sexual assault. The jury was also aware of the brutal nature of many of the murders and of the youth of many of the victims. Trial counsel could not controvert these facts; he could not change them; he was confronted with the task of making an extremely difficult argument. We cannot say that the argument showed professional incompetence. See *People v. Gill* (1973), 54 Ill. 2d 357, 364-65.

Defendant next complains that the prejudicial arguments of the assistant State's Attorneys denied him a fair sentencing hearing. Defendant first argues that the following remark helped to deny him a fair sentencing hearing: "I will be frank with you, ladies and gentlemen, as a citizen of the State of Illinois myself, I don't want to pay this guy's rent for the rest of his life." We agree that the remark was improper as it tended to inject the "cost factor" and the assistant State's Attorney's personal beliefs into the jury's deliberations. It is clear, however, that the remark was merely a sarcastic asser-

tion that life imprisonment for defendant to allow him to be studied was an inadequate punishment. In the context in which it was made, and on this record, we hold that the error in failing to sustain the objection to the remarks of the assistant State's Attorney was harmless. We also note that the objection to the assistant State's Attorney's statement about rent was posed as follows: "Objection, Judge. Then let Mr. Kunkle pull the switch." The court may have decided that an objection made in that form should pass without further comment.

Defendant next complains that the following argument was improper:

> "The evidence will show that John Gacy is plainly and simply an antisocial person. That only means that he will murder and murder and murder again and again, if you allow him to do so."

While defendant argues that the insinuation that if he were sentenced to life imprisonment he would kill again was improper because it was not supported by the record, we cannot agree in light of the fact that defendant was convicted of 33 murders. We also note that the inference may be drawn that defendant's prior imprisonment had failed to deter him from committing further crimes.

Defendant contends that the assistant State's Attorney argued to the jury that if it did not sentence defendant to death, it would not have followed the law, it would have failed to do its duty, it would have ignored the mandate of the citizens of Illinois, and it would have made a mockery of the law and the concept of justice. Defendant asserts that the statements, in effect, directed a verdict of death and stripped the jury of its duty to weigh the evidence fairly and dispassionately decide on the proper sentence. We cannot agree. From the context of the statements, we find that the assistant State's Attorney was merely arguing that the People

had proved their case, and were entitled to a decision in their favor. Any implication that a death sentence was mandatory was negated by the jury instructions.

Defendant also argues that the assistant State's Attorney's opening statement at the death penalty hearing was improper because, when commenting on the statutory mitigating factor that the murders were committed while the defendant was under the influence of extreme mental or emotional disturbance, he told the jurors that they had flatly rejected that factor when they found defendant guilty and that the mitigating factors were simply statutory guidelines, and not loopholes for the defendant. It appears, from our reading of the record, that the assistant State's Attorney was arguing that defendant's expert testimony would not show the mitigating factor that the murders were committed while defendant was under the influence of extreme mental or emotional disturbance just as the expert testimony had not shown that defendant should be found not guilty by reason of insanity. We note further that defendant made no objection to this portion of the argument, which waives the issue on appeal. (*People v. Jackson* (1981), 84 Ill. 2d 350, 358-59.) Defendant's objection to the characterization of mitigating factors as statutory guidelines was also not error here, as it fairly described the function of the statutory mitigating factors. (*People v. Jones* (1982), 94 Ill. 2d 275, 282-86.) We also note that when the assistant State's Attorney began to comment further upon the law in regard to mitigating factors, defendant promptly made an objection which was sustained. In sum, we conclude that all the alleged errors during argument, as reviewed together, would not constitute reversible error.

Defendant next complains that the jury was improperly instructed before its deliberations in the death penalty hearing when the court misstated one of the instruc-

tions as follows:

> "If, after your deliberations, you unanimously conclude there are mitigating factors sufficient to preclude imposition of the death penalty, you must sign the verdict form directing a sentence of imprisonment."

The instruction as tendered to the jury in written form, read:

> "If, after your deliberations, you are not unanimous in concluding that there are no mitigating factors sufficient to preclude imposition of the death sentence, you must sign the verdict form directing a sentence of imprisonment."

Not only was the jury given the correct version in the written instruction, but the verdict form also gave the correct version of the law, as did oral instructions before argument on the death sentence, and in another portion of the oral instructions to the jury before their deliberations. Thus, none of the written instructions were incorrect, but a discrepancy existed in the oral instructions. We note that defendant did not attempt to correct the judge when the incorrect version of the instruction was read. Defendant cites the cases of *People v. Kubat* (1983), 94 Ill. 2d 437, *People v. Haywood* (1980), 82 Ill. 2d 540, and *People v. Jenkins* (1977), 69 Ill. 2d 61, in support of his contention that the giving of conflicting instructions to the jury was reversible error. In *Haywood* and *Jenkins*, this court reversed the judgments because conflicting written instructions were given to the jury. We do not find these cases controlling, however, because here defendant does not complain that any of the written instructions were incorrect, only that one of the readings of one of the instructions was misstated. In *Kubat*, the court upheld a sentence of death although the jury had been given conflicting written instructions on the precise issue involved here. While defendant has attempted to distinguish *Kubat* by arguing that the

defendant in that case had waived his right to complain about the conflicting instructions because no objection was made to them, we find the circumstances here more compelling to hold that the error was harmless since the instruction was incorrect in only one of the readings and in none of the written forms. In view of the fact that the jury was instructed correctly as to the law on this point four separate times, all of the written instructions being correct, we fail to see how the jury was left with a mistaken interpretation of the law, or that it was confused on this point.

Defendant contends next that the court should have determined that defendant knowingly and intelligently agreed to a stipulated sentencing hearing. The People and defendant stipulated that all the evidence heard at the trial could be considered by the jury at the death penalty hearing. Defendant argues that such a stipulation was the functional equivalent of a guilty plea and defendant should have been personally addressed to ascertain his understanding of the stipulation and its consequences. We find, however, that since the jurors, in the absence of a stipulation, could consider all the evidence presented at trial in their deliberations upon the death penalty, it was not necessary to obtain defendant's permission for them to do so. Ill. Rev. Stat. 1979, ch. 38, par. 9—1(c); *People v. Lewis* (1981), 88 Ill. 2d 129, 146-47; *People v. Carlson* (1980), 79 Ill. 2d 564, 589-90.

Defendant also complains that a knowing and intelligent waiver of his right to have time to prepare for sentencing should have been placed on the record. We have already considered the reasoning behind immediately proceeding to a sentencing hearing, and we decline to further discuss it here. We note that a defendant normally speaks through his attorney, who stands in the role of agent, and defendant, by permitting his attorney, in his presence and without objection, to immediately pro-

ceed to a sentencing hearing is deemed to have acquiesced in, and to be bound by, his actions. *People v. Sailor* (1969), 43 Ill. 2d 256, 260; *People v. Novotny* (1968), 41 Ill. 2d 401, 410.

Defendant next argues that "because of the significant mitigating evidence contained in this record, the sentence of death imposed upon John Gacy must be vacated ***." Defendant asserts that "virtually all of the expert witnesses for both sides support the proposition that defendant was acting under an 'extreme mental or emotional disturbance,'" a statutory mitigating factor. (See Ill. Rev. Stat. 1979, ch. 38, par. 9—1(c)(2).) Defendant also argues that the evidence of extreme disturbance was not the only mitigating evidence in the record, and that evidence which showed that defendant "was a good husband and stepfather ***, a good friend to many ***, a loving son and brother ***, a successful businessman ***, a civic leader active in charitable work and politics ***," and while awaiting trial, "an ideal prisoner," also constituted mitigating evidence.

Citing *People v. Brownell* (1980), 79 Ill. 2d 508, the People argue that the decision at sentencing in a capital case is a balancing process in which the seriousness of the crime must be weighed against whatever mitigating factors exist. The People then detail the heinous nature of defendant's crimes both with the living victims and those who did not survive. The People assert that it is "just not true" that the People's expert witnesses claimed that defendant suffered from an extreme emotional disturbance. Rather, the People assert, all of the People's experts stated that he was suffering "from a mere personality or character disorder."

We need not address the argument whether the jury was required to accept that the collective expert testimony in this case established that defendant was suffering from an extreme mental or emotional disturbance.

As the People correctly point out, the decision at sentencing in a capital case is a balancing process. (*People v. Brownell* (1980), 79 Ill. 2d 508.) While many labels were placed on defendant's mental condition, all of the People's experts characterized defendant's defect as a personality or character disorder. In light of the number of victims in this case, their age, the sadistic sexual torturing of Rignall and Donnelly, the attacks on other victims both in Illinois and Iowa, and the other aggravating factors, we cannot say that the jury was required to determine that whatever emotional disturbance defendant suffered precluded the sentence of death. Furthermore, much of the mitigating evidence to which defendant points is questionable. Many witnesses indicated that the only reason defendant was involved in charitable or political work was in order to manipulate others or gain advantage for himself. For example, there was evidence in the record that defendant liked to "play clown" because he could grab the breasts of women in a crowd watching a parade and get away with it. Defendant may have been a good husband and stepfather to his second wife and her children, but the evidence concerning his former marriage is anything but mitigating. The evidence established that defendant offered his wife to adolescent boys in exchange for oral sex. Apparently he has not seen his own children since he left Iowa. The evidence of defendant's "horribly troubled childhood" is questionable. While the evidence indicated that defendant's father was an alcoholic, was disapproving, and physically abusive to both defendant and his mother, defendant did have a loving mother and loving siblings. Defendant's mother was conscientious concerning defendant's education, and was supportive of defendant in his childhood and even in his adult life when defendant returned to Chicago. A disapproving father does not excuse 33 homosexually related murders and numerous

other incidents of sexual torture and physical abuse. We decline to disturb the jury's determination.

Defendant also complains that a second jury should have been impaneled for the death penalty hearing since the original jury allegedly confused the statutory mitigating factor of extreme emotional or mental disturbance with the issue of insanity. Defendant alleges that if a different jury had been impaneled its attention would have been focused solely on aggravation and mitigation without the distraction of the insanity determination. Defendant contends that the jury was confused as to the requirements of the mitigating factor as differentiated from the defense of insanity and that this was evidenced by the confusion shown by the attorneys in their arguments in the death penalty hearing.

We cannot determine on this record that the jury was confused. The record shows that the defense attorneys were sufficiently able to distinguish between the defense of insanity and the mitigating factor of extreme mental or emotional disturbance. Even if it could be shown that the jury was confused, we do not believe that that would constitute sufficient "good cause" to warrant a second jury. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(d)(2).) In *People v. Lewis* (1981), 88 Ill. 2d 129, the defendant advanced similar arguments, contending that a second jury would not have preconceived notions that the death penalty should be imposed. We rejected the defendant's arguments in that case, and find that case apposite here.

Defendant next contends that the failure of the death penalty statute to require that the People prove beyond a reasonable doubt the absence of mitigating factors sufficient to preclude the death penalty makes that statute unconstitutional. We rejected this contention in *People v. Eddmonds* (1984), 101 Ill. 2d 44, 68, and we decline to reconsider it here.

Defendant also contends that the unlimited introduc-

tion and consideration of nonstatutory aggravating factors renders the death penalty statute unconstitutional. Defendant relies upon *Henry v. Wainwright* (5th Cir. 1981), 661 F.2d 56, *vacated and remanded* (1982), 457 U.S. 1114, 73 L. Ed. 2d 1326, 102 S. Ct. 2922, *aff'd on remand* (5th Cir. 1982), 686 F.2d 311, *vacated and remanded* (1983), 463 U.S. 1223, 77 L. Ed. 2d 1407, 103 S. Ct. 3566, in support of his argument. We have rejected defendant's contention, and the applicability of *Henry* thereto in *People v. Davis* (1983), 95 Ill. 2d 1, 38, and in *People v. Free* (1983), 94 Ill. 2d 378, 427, and decline to reconsider it here. We also note that the Supreme Court has upheld a death sentence notwithstanding the consideration by the sentencing court of a nonstatutory aggravating factor. *Barclay v. Florida* (1983), 463 U.S. 939, 77 L. Ed. 2d 1134, 103 S. Ct. 3418.

Defendant also contends that the death penalty statute is vague since it does not define the term "extreme mental or emotional disturbance." In *Proffitt v. Florida* (1976), 428 U.S. 242, 255-58, 49 L. Ed. 2d 913, 924-26, 96 S. Ct. 2960, 2968-69, the Supreme Court rejected this argument with respect to similar wording in a Florida statute. In *People v. Brownell* (1980), 79 Ill. 2d 508, 528-36, we considered whether the sentencing standards of our death penalty statute are vague, and found them to be sufficiently specific. We decline to reconsider that decision on the basis of defendant's argument here. Defendant has also argued that the use of the term "extreme" renders the statute unconstitutional as it improperly limits the jury's consideration of any level of mental or emotional disturbance as a mitigating factor. We find this portion of defendant's argument to be without merit as the jury was specifically instructed to consider "any other facts or circumstances that provide reasons for imposing less than the death penalty."

Defendant also argues that the death penalty statute is unconstitutional for failing to require that the jury specify whether it has found mitigating factors to be present. We rejected this argument in *People v. Gaines* (1981), 88 Ill. 2d 342, 383, and decline to reconsider it here. See also *People v. Brownell* (1980), 79 Ill. 2d 508, 541-44.

Defendant has also contended that the sentence discretion vested in the prosecution by the death penalty statute is an unconstitutional delegation of legislative and judicial authority. This court rejected that argument in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, and adhered to its holding in later decisions, *e.g., People v. Eddmonds* (1984), 101 Ill. 2d 44, 69; *People v. Lewis* (1981), 88 Ill. 2d 129, 146.

Defendant contends that it was error to permit the People to both open and close final arguments at the death penalty hearing. We have considered this question in *People v. Eddmonds* (1984), 101 Ill. 2d 44, 66, in the context of whether in failing to object to the procedure counsel failed to render effective assistance. We held that since the People are the moving party in a death penalty proceeding they are entitled to rebuttal argument. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(d); see *Liptak v. Security Benefit Association* (1932), 350 Ill. 614.) The fact that defendant, in effect, stipulated to the statutory aggravating factor which the People were required to prove beyond a reasonable doubt does not alter that requirement. The circuit court did not err in permitting the People to open and close the arguments at the sentencing hearing.

Defendant has also argued that the death penalty statute is unconstitutional because it fails to provide adequate comparative review procedures. We have rejected this contention (*People v. Brownell* (1980), 79 Ill. 2d 508, 541-44) and will not reconsider it here.

Defendant next argues that the death penalty statute requires that where a defendant is convicted of more than one murder, but the deaths occurred in unrelated acts, no aggravating factor exists unless it is proved that these acts were premeditated. Our statute provides that a defendant may be sentenced to death if he "has been convicted of murdering two or more individuals *** regardless of whether the deaths occurred as the result of the same act or of several related or unrelated acts so long as the deaths were the result of either an intent to kill more than one person or of separate premeditated acts ***." (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(3).) Defendant argues that since any premeditated murder encompasses an intent to kill, the General Assembly must have intended to require that when the deaths occur in the same or related acts, the People must prove only an intent to kill more than one person and when the deaths occur in unrelated acts, it must be proved that these killings were premeditated. Defendant argues that any other interpretation would make the phrase "premeditated acts" meaningless and superfluous. These contentions were considered and rejected in *People v. Davis* (1983), 95 Ill. 2d 1, 34-36, and will not be reconsidered here.

Defendant has also contended that his sentences must be vacated and the cause remanded for resentencing because the court sentenced him without the benefit of a presentence investigation report. Defendant concedes that this court in *People v. Gaines* (1981), 88 Ill. 2d 342, 372-74, held that a presentence investigation report is not required in capital murder cases. Defendant also argues, however, that his natural life sentences for the 21 counts of murder which occurred prior to the effective date of the death penalty statute required a presentence investigation report. Defendant has not shown, however, how he was prejudiced by the lack of such a report. We

also note that the examination of the history, background and mental state of defendant was quite thorough at trial, and that the information derived therefrom substantially fulfills the requirements (Ill. Rev. Stat. 1979, ch. 38, par. 1005—3—2(a)) of the presentence investigation report. We see no additional purpose to be served by a formal presentence investigation report under the facts of this case. Defects in a presentence investigation report may be waived (*People v. Godinez* (1982), 91 Ill. 2d 47, 56-57; *People v. Meeks* (1980), 81 Ill. 2d 524, 533-34), and no objection was raised when the court proceeded to immediate sentencing on all the charges. In fact, one of the attorneys for the defendant stated on the record, outside the defendant's presence, that it was the defendant's request that he be sentenced immediately, without the benefit of a presentence investigation report. We see no basis upon which to find that a formal written presentence investigation report would alter the judge's determination on the facts of this case.

Defendant's last contention is that his rights were violated when he was not permitted to be present when his attorneys made the motion for a new trial. We fail to see how defendant was prejudiced by his absence from this portion of the proceedings. Although the motion made on his behalf was denied, it preserved all alleged errors on appeal, and thus inured to his benefit. While defendant has a fundamental right to be present at any critical stage of the proceedings against him, he does not have an absolute right to be present also at the argument of motions subsequent to verdict. (*People v. Woods* (1963), 27 Ill. 2d 393, 395; *United States v. Lynch* (3d Cir. 1942), 132 F.2d 111, 113; see also *Snyder v. Massachusetts* (1934), 291 U.S. 97, 106-08, 78 L. Ed. 674, 678-79, 54 S. Ct. 330, 332-33.) Defendant argues that he should have been permitted to present his own arguments in support of the motion for a new trial. Defend-

ant was, however, represented by counsel and until his appearance in this court had made no request to be permitted to defend himself. On these facts, we must conclude that defendant waived his right to personally argue the motion for a new trial. (*People v. Ephraim* (1952), 411 Ill. 118, 122-23.) Defendant also contends that he should have been present when the record was corrected to show that on March 13, 1980, when the death penalty verdict was returned, defendant waived his right to a presentence investigation and requested the immediate imposition of sentence. Defendant's presence, however, was not necessary for a correction of the record. (*People v. Hirschberg* (1951), 410 Ill. 165, 168.) Defendant has also complained that he should have been allowed to hear in person why the court imposed natural life sentences upon him and also to witness the summary denial of his motion for a new trial. On these facts we cannot see how defendant was prejudiced in this regard.

In their brief, *amici curiae*, 60 in number, argue that the death penalty is *per se* unconstitutional. *Amici* argue, *inter alia*, that in order to deprive someone of a fundamental right, life, the People must prove that the death penalty is necessary to further some compelling State interests. *Amici* concede that deterrence is a compelling State interest but, citing statistical studies, argue that the death penalty does not deter. The People respond that the statistical studies upon which *amici* rely are "based on obsolete data interpreted in a crude and misleading manner." The People contend that the application of more advanced statistical techniques, such as regression analysis, yields results contrary to the studies cited by *amici*. Moreover, the People assert, the studies cited by *amici* do not cite the statistical significance of particular death statutes and particular types of homicide, but rather categorize all homicides and all death penalty statutes in one category. The People contend

that while the death penalty may not deter a crime of passion, the death penalty in Illinois is not applicable to such a crime, but may very well provide the deterrence for a criminal who wishes to eliminate potential witnesses, the murderer who kills people in exchange for money, and other premeditated murderers. The People contend that the Supreme Court has already rejected *amici's* argument:

> "Statistical attempts to evaluate the worth of the death penalty as a deterrent to crimes by potential offenders have occasioned a great deal of debate. * * *
>
> Although some of the studies suggest that the death penalty may not function as a significantly greater deterrent than lesser penalties, there is no convincing empirical evidence either supporting or refuting this view. We may nevertheless assume safely that there are murderers, such as those who act in passion, for whom the threat of death has little or no deterrent effect. But for many others, the death penalty undoubtedly is a significant deterrent. There are carefully contemplated murders, such as murder for hire, where the possible penalty of death may well enter into the cold calculus that precedes the decision to act. And there are some categories of murder, such as murder by a life prisoner, where other sanctions may not be adequate.
>
> The value of capital punishment as a deterrent of crime is a complex factual issue the resolution of which properly rests with the legislatures, which can evaluate the results of statistical studies in terms of their own local conditions and with a flexibility of approach that is not available to the courts." *Gregg v. Georgia* (1976), 428 U.S. 153, 184-86, 49 L. Ed. 2d 859, 881-82, 96 S. Ct. 2909, 2930-31.

Because we are of the opinion that they are not presented to the proper forum, we do not address the merits of *amici's* arguments. *Amici's* central argument is premised on the accuracy of the statistical data which they cite in support of their contentions. Although *amici*

assert that "there is virtually no serious study that indicates the death penalty is a deterrent above and beyond imprisonment ***," the People cite recent studies which reach the opposite conclusion. As noted in *Gregg*, the determination of whether capital punishment is a deterrent to certain types of murders such as those enumerated in the Illinois death penalty statute is an issue the resolution of which properly rests with the General Assembly. We decline to usurp the legislative function.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed. The clerk is directed to enter an order setting Wednesday, the 14th day of November, 1984, as the date on which the sentence of death entered by the circuit court of Cook County shall be executed. The defendant shall be executed by a lethal injection, in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). A certified copy of this order shall be furnished by the clerk of this court to the Director of the Department of Corrections, to the warden at Stateville Correctional Center, and to the warden of the institution wherein the defendant is confined.

*Judgment affirmed.*

JUSTICE SIMON, concurring in part and dissenting in part.

I agree that the convictions of murder should be affirmed in this case. However, for the reasons set forth in my separate opinions in *People v. Lewis* (1981), 88 Ill. 2d 129, 179 (Simon, J., dissenting), and in *People v. Silagy* (1984), 101 Ill. 2d 147, 184 (Simon, J., concurring in part and dissenting in part), I believe that the Illinois death penalty statute is unconstitutional and that the death sentence should be vacated.